UNITED STATES of America, Plaintiff,

v.

ALL MONIES ($477,048.62) IN ACCOUNT NO. 90–3617–3, ISRAEL DISCOUNT BANK, NEW YORK, NEW YORK, Defendant.

No. 89–00469 ACK.

United States District Court,
D. Hawaii.

Jan. 23, 1991.

---

Daniel Bent, Florence Nakakuni, Stefan D. Cassella, Trial Atty., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Stillman Friedman & Shaw, Edward Shaw, New York City, Hart & Wolfe, Peter Wolfe, Honolulu, Hawaii, for defendant.

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING PARTIES' MOTIONS FOR SUMMARY JUDGMENT

KAY, District Judge.

This matter comes before this Court pursuant to Motions for Summary Judgment on behalf of both Plaintiff United States and Claimant Henry Lelouch.

### A. THE MELENDEZ AND DIRIMEX ORGANIZATIONS

Emilio Melendez was part of a drug trafficking organization in Peru headed by his brother, Carlos Melendez. As part of their operation, the Melendez organization used the services of two professional money exchangers, Maria Elena Sarria and Luz Mary Aguad, as well as Emilio Melendez, to launder the illegal proceeds of the activity. Carlos Melendez and other drug traffickers would acquire United States currency from the sale of drugs. Sarria, Aguad, and Emilio Melendez, using their exchange house named Dirimex, would "launder" these U.S. dollars by selling them to Peruvian capitalists through the black, or "parallel," market in Lima. The capitalists would pay for the dollars with Peruvian currency. Generally, but with some notable exceptions, Sarria, Aguad, and Melendez would transfer the illegal dollars by wire to their own accounts in the United States. Then the money would be wired to the capitalists' accounts held in New York and Miami. Some of the Peruvian currency obtained by Sarria, Aguad, and Emilio Melendez would then be used to provide the drug traffickers with local currency to purchase raw materials necessary for their drug operations. There were also direct transfers from accounts of the Medellin cartel in South America to the capitalists' accounts in New York and Miami to accomplish the laundering.

Four of the principals in the Melendez/Sarria organization have been charged with criminal offenses in the United States: (1) Emilio Melendez was convicted of conspiring to import cocaine into the United States; (2) Carlos Melendez has been indicted in Florida for conspiring to violate the

money laundering laws of the United States; (3) Sarria has also been indicted on money laundering charges in Florida; (4) Jaime Ferreyra, a Peruvian lawyer who represented Sarria and other Melendez organization members in connection with the Peruvian arrests, was indicted and pled guilty in Hawaii on charges of attempting to obstruct justice. Ferreyra attempted to bribe Emilio Melendez in return for Melendez giving false testimony in support of the claimants in civil forfeiture cases arising out of the organizations' operations.

Numerous civil forfeiture cases, of which the instant case is one, have stemmed from this underlying criminal investigation. These cases are collectively referred to as the *"All Monies"* cases. The accounts seized in the *All Monies* cases are suspected of being accounts to which some of the illegal dollars were transferred. The claimants are capitalists suspected of purchasing money from Sarria, Aguad, and Emilio Melendez.

The claimant in this case, Henry Lelouch, owns a money exchange, or "cambio," in Peru. A major part of his business is the buying and selling of U.S. dollars and Peruvian intis. Lelouch owns a bank account under the name "Ontivero" at the Israel Discount Bank in New York. The Ontivero account received several deposits of dollars which have been traced to illegal drug transactions carried out by the Melendez organization and laundered by the Sarria organization. The Ontivero funds in the Ontivero account were seized and they are the subject of this civil forfeiture action.

## B. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The United States Supreme Court has declared that summary judgment must be granted

against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *Id.* at 322, 106 S.Ct. 2548. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Electrical. Serv. v. Pacific Elec. Contractors Assoc.,* 809 F.2d 626, 630 (9th Cir.1987). Instead, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *Id.* At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987), *citing, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Id.*

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538

(1986). Indeed, "if the factual context makes the nonmoving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics,* 818 F.2d at 1468 (emphasis original), *citing, Matsushita, supra,* 475 U.S. at 587, 106 S.Ct. at 1356. Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *T.W. Elec. Services,* 809 F.2d at 630–31.

## C. PROBABLE CAUSE

■ Before forfeiture will lie, the government must demonstrate probable cause to believe that the seized property was involved with illegal drug or money laundering transactions in one of the ways specified in the governing statutes. In determining the existence of probable cause, the court must look to the "aggregate facts." *United States v. Padilla,* 888 F.2d 642, 643–44 (9th Cir.1989) (citing *United States v. $5,644,540.00 In U.S. Currency,* 799 F.2d 1357, 1363 (9th Cir.1986)). Probable cause exists when the aggregate of facts gives rise to more than a mere suspicion that the property was involved in or intended to be involved in the illegal activity; the presence or absence of any single fact is not dispositive. *Padilla,* 888 F.2d at 643–44.

■ Hearsay evidence is admissible to prove probable cause in forfeiture cases. *United States v. One 56–Foot Yacht Named Tahuna,* 702 F.2d 1276, 1283 (9th Cir.1983). However, hearsay evidence is not admissible to establish or rebut a claimant's innocent owner defense. *United States v. Property Known as 6109 Grubb Road,* 886 F.2d 618, 622 (3d. Cir.1989); Smith, *Prosecution and Defense of Forfeiture Cases,* ¶ 11.03[5] (1988). This distinction is important in this case because much of the government's evidence is contained in declarations by people who investigated the Melendez organization. *See* Declarations of Raymond Byrne, Helmut Groebe, and David Panek. A substantial amount of hearsay evidence is contained in those declarations.

■ An illegal seizure will not preclude forfeiture if the government can establish probable cause with untainted evidence obtained through investigation and/or discovery conducted after the initial seizure. *United States v. One 1985 Cadillac Seville,* 866 F.2d 1142, 1146 (9th Cir.1989). The claimant does not allege that any of the evidence put forth by the government in this case is tainted.

The government has been able to show probable cause to believe that several transfers of dollars into Lelouch's "Ontivero" bank account were proceeds of narcotics transactions as defined in 21 U.S.C. § 881(a)(6). Further, the government has been able to show probable cause that the dollars in those transfers qualify as property involved in illegal money laundering transactions as defined in 18 U.S.C. § 981(a)(1)(A) & (B). Claimant Lelouch concedes that the government has carried its burden of showing there was probable cause to seize $242,012.69 of the $477,048.62 in his account at time of seizure. The claimant has not conceded, however, that probable cause has been shown as to the remaining money in his account. This Court must therefore address the issue of probable cause as it pertains to the balance of the account over $242,012.69 before addressing the issue of the claimant's innocent owner defense.

The government has asserted the following five alternative grounds for forfeiture in its amended complaint:

(1) & (2) the property had been furnished in exchange for a controlled substance, or was proceeds traceable to such an exchange in violation of 21 U.S.C. § 881(a)(6); $225,462.69 of the account monies are forfeitable under these theories;

(3) the property was the proceeds of foreign drug trafficking offenses in violation of 18 U.S.C. § 981(a)(1)(B); claimant concedes that $242,012.69 of the account monies are forfeitable under this theory; the government asserts that an addition-

al $75,700 over the $242,012.69 should be forfeited under this theory.

(4) the property was involved in money laundering offenses in violation of 18 U.S.C. § 981(a)(1)(A); all of the account monies are forfeitable under this theory;

(5) the property was used to facilitate drug transactions in violation of 21 U.S.C. § 881(a)(6); all of the account monies are forfeitable under this theory.

Because Lelouch concedes that probable cause has been established for forfeiture of part of the account's funds under alternative 3 above, the theories under alternatives 1 and 2, which would forfeit smaller amounts than alternative 3, are no longer relevant. Further, this Court finds that probable cause for forfeiture of the entire Ontivero account has been established under alternatives 4 and 5. *See* discussion *infra.* Therefore, alternative 3, which forfeits only part of the account, is not necessary to this Court's holding. However, the facts that the government used to establish alternatives 1, 2, and 3 are the same facts which provide the basis for alternatives 4 and 5. Those facts are still relevant to this Court's discussion of probable cause.

### 1. *Probable Cause Under Alternatives 4 and 5*

Alternative 4 set forth by the government would cause the entire Ontivero account balance of $477,048 to be forfeitable. Alternative 4 is based on 18 U.S.C. § 981(a)(1)(A) which provides that any property "involved in a transaction or attempted transaction in violation of ... section 1956 or 1957 of this title, or any property traceable to such property," is forfeitable to the United States. Sections 1956 and 1957 are the money laundering statutes enacted in the Money Laundering Control Act of 1986.

The parties agree that $242,012.69 of the money in the Ontivero account were proceeds of foreign drug trafficking offenses and is therefore forfeitable under § 981(a)(1)(B). The parties disagree, however, about whether the scope of § 981(a)(1)(A) reaches the remaining untainted funds in the Ontivero account. To reach those funds, the government suggests that a "facilitation theory" be applied to the facts of this case.

### a. *Applicability of Facilitation Theory*

There is no doubt that Sarria, Aguad, and Emilio Melendez violated the money laundering statutes referred to in § 981. They sent millions of dollars into the United States in exchange for local Peruvian currency in order to launder them and to help the Melendez organization buy more raw merchandise for its drug operations. They knew that the money was the proceeds of drug trafficking and the purpose of the transaction was to conceal or disguise the nature of those proceeds. Those actions were violations of 18 U.S.C. §§ 1956 and 1957. The government argues under its alternative 4 that the Ontivero account was used to "facilitate" the money laundering violations committed by Sarria and her partners. The government asserts that all of the money in Lelouch's Ontivero account is forfeitable because the money from legitimate sources helped conceal the tainted money, thus lending a cover of legitimacy to the tainted money.

The statute on which the government relies for its theory under alternative 4, 18 U.S.C. § 981(a)(1)(A), does not contain the word "facilitate" anywhere in it. Section 981(a)(1)(A) does provide, however, that any property "involved in" a transaction in violation of §§ 1956 or 1957 is forfeitable. Alternative 5, on the other hand, is based on 21 U.S.C. § 881(a)(6), which does expressly use the word "facilitate." Section 881(a)(6) provides that all moneys "used or intended to be used to facilitate any violation" of the federal drug laws are subject to forfeiture.

The cases the government cites, with the exception of one discussed directly below, all involve interpretation of 21 U.S.C. § 881(a)(6) or similar statutes which expressly include the "facilitate" language. The government argues that the legislative history of 18 U.S.C. § 981(a)(1)(A) suggests that § 981 should also be interpreted to encompass property that is used to facilitate illegal activity. To support that posi-

tion, the government quotes the following relating to § 981(a):

> [T]he term "property involved" is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense.

134 Cong.Rec. S17365 (daily ed. Nov. 10, 1988).

 This Court finds that 18 U.S.C. § 981(a)(1)(A) applies to all property that facilitates violations of §§ 1956 and 1957. Even though § 981 does not expressly include the words "facilitate" or "facilitating," the statute covers property "involved in" illegal money laundering transactions. *See* 18 U.S.C. § 981(a)(1)(A). The legislative history makes it clear that "property involved in" includes property used to facilitate money laundering offenses.

Moreover, the government's alternative 5 is based on 21 U.S.C. § 881(a)(6), which includes facilitation language. Section 881(a)(6) covers "all moneys ... used or intended to be used to facilitate" drug trafficking offenses. All of the arguments about whether the Ontivero account facilitated the Sarria and Melendez drug and money laundering operations are applicable to either alternative 4 or alternative 5. Thus, the government's facilitation theory is applicable under either 18 U.S.C. § 981(a)(1)(A) or 21 U.S.C. § 881(a)(6).

#### b. Scope of Facilitation Theory

Courts have defined the scope of the facilitation theory in cases involving statutes which expressly use facilitation language. There is no reason to believe the scope of the theory should be any different under § 981.

 Facilitating property is forfeitable if it makes the underlying criminal activity less difficult or "more or less free from obstruction or hindrance." *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990). To be forfeitable, there must be a substantial connection between the property and the illegal activity. *Id.* at 989–90. There must be more than an incidental or fortuitous connection between the property

and the illegal activity, but the property need not be indispensable to the commission of the offense. *United States v. 3639–2nd St., N.E.*, 869 F.2d 1093, 1096 (8th Cir.1989). Nor does the property need to be used exclusively for illegal activity. *Schifferli*, 895 F.2d at 991. If a portion of the property is used to facilitate the offense, then all of the property is forfeitable. *United States v. Santoro*, 866 F.2d 1538, 1542 (4th Cir.1989).

Under 21 U.S.C. § 853(a)(2)—a statute which includes the "facilitating" language—a ranch and all of the assets associated with it was forfeitable when the rancher used the ranch as a cover for a heroin distribution business. *United States v. Rivera*, 884 F.2d 544 (11th Cir. 1989). The livestock and other assets were forfeitable, in addition to the ranch itself, because those assets made it easier to disguise the illegal drug transactions that occurred there. *Id.* Similarly, under 21 U.S.C. § 881(a)(7)—which also includes "facilitating" language—a dentist's office was forfeited when he was convicted of writing illegal prescriptions because the office made it easier for the dentist to hold himself out as a person authorized to write prescriptions. *Schifferli*, 895 F.2d at 991.

 Nothing in either § 881 or § 981 conditions forfeiture on the claimant directing or managing the illegal activity. This is an *in rem* action. Because the property is the wrongdoer, forfeiture can be ordered even in the absence of any wrongdoing on the part of the claimant. *See United States v. Leong Chinese Merchants Assn. Building*, 918 F.2d 1289 (7th Cir.1990). The broad language and legislative history of 18 U.S.C. § 981 and 21 U.S.C. § 881 makes it clear that any property involved in illegal activity in a way which facilitates that activity is forfeitable. This susceptibility to forfeiture is limited, of course, by affirmative defenses such as the innocent owner defense raised by Lelouch in this case.

#### c. Facilitation Theory and the Facts of This Case

The government bases its facilitation theory in this case primarily on three sets of

transactions. On October 4, 1988, $500,000 was transferred from the Forville Holding account at Banco de Occidente, an account connected with the Medellin drug cartel, to Lelouch's Ontivero account. In his own records, Lelouch recorded the arrival of this money on October 5 and the name "EMILIO" appears next to the entry. Lelouch testified at his deposition that this referred to Emilio Melendez, but that he does not recall any role played by Emilio in the transaction, nor does he know why the name is in his records. Lelouch Dep., p. 89–96. Lelouch claims that he carried the transaction out with Sarria directly and that an employee wrote Emilio's name in the record. Lelouch Dep. at p. 89–90.

Once the $500,000 arrived in the Ontivero account, Lelouch transferred $390,000 from the account to various other persons, including four of the claimants in the *All Monies* cases. These disbursements appear in Lelouch's records with the name "EMILIO" next to them, and correspond to instructions Lelouch gave to his bank to disburse the money to people he understood to be Elena Sarria's clients. Lelouch Dep. at p. 97–98. In this fashion, the government contends the Ontivero account was used to "facilitate" the Sarria/Melendez money laundering scheme.

Claimant Lelouch presents a different version of the October 4, 1988 transaction. Lelouch asserts that the transaction was not out of the ordinary for a person involved in his business. Lelouch alleges that he received the $500,000 transfer on consignment from Sarria—that is he agreed to take the dollars into his account, negotiate a price, and attempt to find buyers, without committing to purchase any amount he could not sell. Sarria told him that she would be transferring between $300,000 and $500,000. Lelouch Dep., p. 195. According to Lelouch, when the transfer arrived at Ontivero, Sarria said to Lelouch, "you go out and sell and I go out and sell." Lelouch Dep., p. 110. Lelouch says he started contacting his clients who needed dollars and Sarria did the same, but that she was able to place a larger amount than Lelouch. *Id.* Lelouch kept $110,000 which he had sold to his clients and Sarria later told Lelouch that she had placed $390,000. *Id.* Lelouch contends that this arrangement was exactly the same type of arrangement which he has with other cambistas (money exchanges). *Id.* at 325; 326–34.

The government points to a second transaction which it argues facilitated money laundering violations. On May 23, 1988, Sarria arranged for the transfer of $1 million in Medellin money. Five hundred thousand dollars of the money was deposited in Sarria's account at the Israel Discount Bank. The other $500,000 was deposited into the Ontivero account on the same day. Lelouch Dep. Exhibits 13A & B, at 14. The next day, May 24, 1988, Lelouch transferred $400,000 from the Ontivero account to Sarria's account. Lelouch Dep. Exhibit 15. Lelouch admitted at his deposition that he and Sarria personally discussed the transfer of the money to his account and the subsequent disbursement of all but $100,000 to Sarria.

Again, Lelouch has an explanation for the transaction. Lelouch claims that Sarria called him to ask if he was in a position to take $300,000. Lelouch Dep. at 194. Lelouch agreed to take the dollars on consignment. In a routine daily call to the Israel Discount Bank to check current deposits, Lelouch learned that $500,000, not $300,000, had been transferred to Ontivero. *Id.* at 205–06. He was surprised that a larger sum had arrived, but the amount of money available to Sarria for consignment to Lelouch "depended on what options had come up for her during the course of the day." *Id.* at 195. Lelouch contends there was no commercial reason for Sarria not to transfer more or less dollars if she had them available, because Lelouch was not obligated for any amount under the arrangement. *Id.* at 208–09. Lelouch claims he had no knowledge that Sarria also received $500,000 from the Medellin sources into her own account on the same day.

Lelouch claims that Sarria asked Lelouch to spend several hours attempting to find customers for the $500,000, which he did. Lelouch was able to place only $100,000. *Id.* at 201. Sarria then asked that the

remaining $400,000 be transferred to her account. *Id.* at 213. As Lelouch explained, such limited duration consignment arrangements were not out of the ordinary for the cambista business, due to the volatile currency exchange rates in Peru at the time. *Id.* at 212.

Lelouch later acknowledged that something about this particular transaction made him "uncomfortable about the situation." *Id.* at 219. However, according to Lelouch, his concern about this and other Sarria transactions arose only in retrospect, after the seizure of his account. *Id.* at 219–23.

A third group of transactions is also cited by the government as transactions which should have made Lelouch suspicious. On August 8, 1988, Dirimex received $1.5 million dollars from Medellin cartel accounts at Banco de Occidente. The money was received in two deposits of $750,000 each into Dirimex accounts (GAF-RUR and EUROSPORT) held jointly by Sarria, Melendez, and Aguad. Some of the money was then dispersed from the GAF-RUR and EUROSPORT accounts to Lelouch's Ontivero account in deposits of $336,000, $40,000, $25,000, and $15,000 between August 9 and August 15, 1988.

Lelouch, as with the other large transactions involving Medellin money, contends the transactions in August, 1988, were routine. Lelouch claims that the transfers represented a $300,000 consignment from Sarria together with $36,000 owed by Sarria to Lelouch on an earlier purchase of dollars. Lelouch Dep., p. 243–44. Lelouch claims he was able to sell the $300,000 to his customers in several hours.

Finally, the government presents evidence from Helmet Groebe, a confidential informant involved in the underlying criminal investigation, that Emilio Melendez, in Groebe's presence, pointed to accounts on a list which Melendez indicated he "controlled." *See* Declaration of Helmet Groebe at ¶ 33. One of the accounts Emilio supposedly implicated was Lelouch's Ontivero account.

From the above transactions and that statement by Melendez, the government ar-gues it can be concluded that Sarria and Melendez understood that they were allowed to use the Ontivero account to assist them in moving sums of money from South America to the United States in violation of money laundering laws. The government argues that the Ontivero account provided a "cover" for their criminal activity by making it appear to be part of legitimate exchanges of currency. The Ontivero account, according to the government, provided the activities of Sarria and Melendez with "an air of legitimacy and protection from outside scrutiny," thus making their crimes "more or less free from obstruction or hindrance." *See Schifferli,* 895 F.2d at 991. Thus, the government argues the Ontivero account "facilitated" the laundering of drug money, and, as a result, the entire account should be deemed forfeitable.

There is no doubt that the transactions involving Medellin money and the Ontivero account helped the Dirimex operators launder drug money. The government does not dispute, however, Lelouch's claim that he ran a business in which most of the transactions were legitimate transactions.

■■■■ The government, however, need only show there was probable cause that the money in the Ontivero account facilitated the illegal activity. Property may not be considered to have facilitated illegal activity unless there is a substantial connection between the property and the illegal activity. *Schifferli, supra,* 895 F.2d at 989–90. The transactions involving tainted funds and the Ontivero account—together with the noted instructions for subsequent disbursement from Emilio Melendez and the Melendez statement that he "controlled" the Ontivero account—are enough to show there is probable cause to believe there was a substantial connection between the Ontivero account and the illegal activity. There is probable cause to believe that the Ontivero account was being used to help launder drug proceeds. As such, both the legitimate and tainted money in the account aided that end. The account provided a repository for the drug proceeds in which the legitimate money could provide a "cover" for those proceeds, thus making it

more difficult to trace the proceeds. There is, therefore, probable cause to believe that all of the money in the Ontivero account facilitated the illegal activities of the Melendez and Dirimex organizations, making the entire account forfeitable under either 18 U.S.C. § 981(a)(1)(A) or 21 U.S.C. § 881(a)(6).

Lelouch argues that the money in the account at the time of seizure was not facilitating any illegal activity because it was not seized until May 27, 1989 and all of the transfers shown to involve tainted money took place before that date. However, the whole basis of the facilitation theory in this case is that the account's legitimate money was necessary to conceal tainted money as part of the laundering scheme. Further, there is no reason to believe that Melendez and Sarria's use of the account had ended before the seizure. The bank records show that money was placed into the Ontivero account by Sarria or Melendez on 38 occasions beginning in 1987 and continuing until May 4, 1989—only 23 days before the money was seized. Finally, Lelouch's arguments regarding whether he had knowledge of any such control by Dirimex or the illegal nature of some of the money in the account, go to his innocent owner defense.

■ Lelouch argues that the facilitation theory should be confined to property belonging to people who have been shown to be principals or conspirators in the underlying illegal activity. While most of the cases thus far have applied the facilitation theory only in such instances, nothing suggests that such a limitation was intended by Congress. Further, as discussed *supra*, in an *in rem* action, it is the property that is the wrongdoer, and forfeiture can be ordered even in the absence of any wrongdoing on the claimant's part. *See United States v. Leong Chinese Merchants Assn. Building*, 918 F.2d 1289, 1293 (7th Cir. 1990). Moreover, the statement by Melendez claiming that Melendez controlled the Ontivero account, coupled with his noted instructions regarding subsequent disbursements substantiates that the account

was used to facilitate the drug money laundering scheme.

■ Finally, any argument that the facilitation theory unfairly sweeps untainted money in with tainted money is disingenuous. The government has shown that over 2.5 million dollars of tainted money was laundered through the Ontivero account, even though only $477,048.62 was in the account at the time it was seized. This dispels in this case any merit there otherwise may have been to the disproportionate forfeiture argument raised in *Leong Chinese Merchants Assn. Building*. *See Leong, supra*, 918 F.2d 1289, 1296.

### 2. Summary Judgment on Probable Cause Issue

■ As the above discussion illustrates, the government has shown probable cause for forfeiture of the entire account. The government has established more than mere suspicion that some of the money in the Ontivero account were proceeds of drug transactions, and that the Ontivero account facilitated illegal drug and money laundering activity. Thus, summary judgment is granted for the government for the entire account regarding the probable cause issue.

### D. INNOCENT OWNER DEFENSE

#### 1. The Law

■ The government brings this forfeiture action under two different statutes. The government's theories under alternatives 1, 2, and 5 rely on 21 U.S.C. § 881. The government's theories under alternatives 3 and 4 rely on 18 U.S.C. § 981. Both statutes include innocent owner defenses, but the requirements for the defense are different for each statute. Under 18 U.S.C. § 981(a)(2), the claimant may avoid forfeiture if he proves by a preponderance of the evidence that he did not know of the illegal activity. Title 21 U.S.C. § 881(a)(6) also requires the claimant to prove that he did not consent to the illegal use of the property. Lelouch admits that certain funds were transferred by his office on the request of the Dirimex partners from his account to accounts of people Lelouch

knew to be clients of Dirimex. However, Lelouch denies knowing that there was anything suspicious or illegal about those transactions. There is no contention by the government that Lelouch overtly consented to allow his account to be used to launder drug trafficking proceeds, Thus, to defeat forfeiture with an innocent owner defense under either statute, Lelouch must prove that he had no knowledge of the illegal activity which his account was involved in.

Both parties agree that "turning a blind eye" or "wilful blindness" will be equated with knowledge of the illegal activity. *See United States v. One 1980 Red Ferrarri*, 827 F.2d 477, 480 (9th Cir.1987). The parties disagree about whether the defense requires Lelouch to prove that he exercised due care in preventing the illegal use of the account. The government argues that the law requires Lelouch to prove he did everything that reasonably could be expected to insure that the property he acquired came from a legitimate source. Lelouch argues that he need only show lack of actual knowledge or "wilful blindness."

The disagreement stems from the Ninth Circuit case *United States v. $215,300*, 882 F.2d 417, 420 (9th Cir.1989), in which the Ninth Circuit Court of Appeals held that failure to exercise due care precludes reliance upon the innocent owner defense. Lelouch argues that *$215,300* is wrongly decided and should not be followed. Lelouch points out that the leading forfeiture treatise states that *$215,300* is "clearly wrong." *See* Smith, *Prosecution and Defense of Forfeiture Cases*, ¶ 4.03, p. 4–44.-12, n. 49.2 (1990). Other federal courts have held that the innocent owner defense does not require proof of due care. *See, e.g., United States v. Lots 12, 13, 14, and 15*, 869 F.2d 942, 946–47 (6th Cir.1989) (argument that innocent owner defense includes requirement that owner has done all he could reasonably be expected to do to prevent proscribed use of property is not applicable to forfeiture under 21 U.S.C. § 881(a)(7)); *United States v. One Urban Lot Located at 1 Street A–1*, 865 F.2d 427, 430 (1st Cir.1989) (21 U.S.C. § 881(a)(6) does not limit innocent owners to those who have done all that reasonably could be

expected to prevent proscribed use of property); *United States v. 316 Units of Municipal Securities*, 725 F.Supp. 172, 180 (S.D.N.Y.1989) (statutory innocent owner defense requires only a showing of ignorance of the illegal transactions); *United States v. Certain Real Property*, 724 F.Supp. 908, 914 (S.D.Fla.1989) (test for innocent ownership does not require proof that claimant was not negligent).

Lelouch argues he should be treated like the Second Circuit treated the claimant bank in *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1162 (2d Cir.1986). In that case, the court held:

> a bank has no duty to investigate the source of its customer's deposits. It acts at its peril only when, as a passive receiver of knowledge, it learns that a deposit is derived from drug profits and nevertheless accepts that deposit. The statute imposes no investigating costs on the banking system.

797 F.2d at 1162.

Several courts, however, have applied a due care type standard to statutory innocent owner defenses. The Eighth Circuit Court of Appeals has held that owners with a suspicion of wrongful activity must make a "reasonable" attempt to prevent a property's unlawful use. *United States v. One 1976 Cessna Model 210L Aircraft*, 890 F.2d 77, 81 (8th Cir.1989). Likewise, the Eleventh Circuit has required innocent owners to prove that they did everything that reasonably could be expected to prevent illegal activity. *United States v. One Bertram 58' Motor Yacht*, 876 F.2d 884, 888 (11th Cir.1989). Further, the First and Second Circuits have applied due care type standards to the consent prong of the innocent owner defense. *United States v. Parcel of Real Property Known as 6109 Grubb Road*, 886 F.2d 618, 626 (3d Cir. 1989); *United States v. 141st Street Corp.*, 911 F.2d 870, 877–78 (2nd Cir.1990).

██ Thus, there is a split in the circuits on the issue. However, as this Court has recently held, this Court is bound by the Ninth Circuit's holding in *$215,300*. *See United States v. Property Titled in the*

*Name of Moises Ponce and Ramona Ponce*, 751 F.Supp. 1436 (D. Hawaii 1990). Lelouch must prove, therefore, that he did not know of the illegal activity, did not wilfully blind himself from the illegal activity, and did all that reasonably could be expected to prevent the illegal use of his Ontivero account.

### 2. Application of Affirmative Defenses to These Facts

Lelouch contends that he has met his burden regarding the innocent owner defense, even under a standard which requires that he do everything that reasonably could be expected of him to prevent the illegal use of his account. As discussed above, any hearsay evidence offered by the government may not be used to decide the innocent owner issue.

### a. Legitimacy of Lelouch's Business

Lelouch first presents evidence that he is a legitimate businessman who operated a legitimate "cambio," or currency exchange business, in Lima. A major part of Lelouch's business has been the purchase and sale of dollars. Such purchases are at the heart of every legitimate Peruvian currency exchange business, because of the hyperinflation and the extreme political instability in Peru. *See* Lelouch Dep. at p. 313–14. Lelouch offers the affidavit of Mohammed Jafri, an economist with expertise in Latin America, to support this contention. Jafri states:

> To protect themselves against Peru's hyperinflation, Peruvians prefer to hold their savings or profits in dollars rather than intis, even for the short term because of the relative stability of the dollar as compared to the inti.

Jafri Affidavit at p. 4. Jafri's affidavit explains the role of "cambios," or money exchangers, in the Peruvian market.

> In view of the inability of the monetary authorities to provide the needed amount of foreign exchange through the official market, Peruvian "cambios" ... greatly expanded their operations and have become major players in the parallel market. The cambios operate within the framework of Peruvian laws and the monetary authorities publish the parallel market exchange rate in official publications. I am informed that more than 100 cambios exist in Lima alone.... The cambios thus perform the vital role of lubricating the foreign commerce of Peru.
>
> Like any other business which supplies commodities to the public, Peru cambios must often trade their goods (*i.e.*, dollars and intis) among each other, to cover the orders placed by customers. For example, when one cambista receives many orders for intis from his customers, he may be required to sell dollars to another cambista to buy the intis he needs. Conversely, if a cambista finds that his customers wish to change a large number of intis into dollars, he may have to purchase the dollars he needs from another cambista, if his available inventory of dollars is not sufficient to cover his customers' orders, or if he does not want to deplete his inventory of dollars. Since successful cambistas hold the largest part of their inventory of dollars with banks in the United States, many of these transactions are conducted by means of an inter-bank transfer of dollars in the United States. These transactions are ordinary and customary in the business of a Peruvian cambista or, for that matter, of exchange houses anywhere else.

*Id.* at p. 4–5.

Jafri reviewed Lelouch's Ontivero account statements and the government's affidavits describing the tainted fund transfers into the Ontivero account. He concluded that the transactions are consistent with the legitimate operation of a currency exchange business. Jafri Affidavit at p. 2. Jafri further concluded that the number and size of the transactions between Ontivero and the accounts described by the government were "routine and unremarkable" and were the "sort of transactions that frequently occur between legitimate and successful currency exchange businesses in Peru." *Id.*

Lelouch also presents the affidavit of Ervin H. Golod, First Vice President of the Israel Discount Bank of New York. Golod's affidavit states his familiarity with currency exchange businesses and his awareness that Lelouch regularly buys and sells dollars and intis. Golod Affidavit, p. 2. Golod concluded that "nothing in my Bank's dealings with Mr. Lelouch and his Ontivero accounts has suggested in any way that the Ontivero accounts have been used for anything other than customary currency exchange business." Golod Affidavit, pp. 2–3. Finally, Lelouch himself testified at his deposition that inflation and political instability causes "anybody who is slightly intelligent ... to put his money in dollars and not intis." Lelouch Dep. at p. 314.

Although the government never directly refutes Lelouch's claim that he ran a legitimate business, it does submit evidence that casts some doubt on that claim. First, Lelouch's bank records were kept in New York and supposedly never seen by him. When Lelouch's wife went to New York, she destroyed the records. Lelouch claims that he had his records kept in New York rather than being sent or brought to him because he did not want any paper trail in Peru connecting him with wealth. This was done, Lelouch claims, because people who are found to be wealthy are subject to violence, kidnapping, and extortion in Peru. It appears that Lelouch had constant telephonic communications with his bank, however, and it seems that he would have been told by his banker the sources of the money being transferred to his account. Second, the government asserts that some of Lelouch's business may have been in violation of Peruvian anti-flight capital laws, although that question has not been answered satisfactorily by either party. Further, the numerous direct transfers, including Melendez' noted instructions regarding subsequent disbursments, from Medellin cartel accounts to the Ontivero account cast suspicion on the legitimacy of Lelouch's money exchange.

### b. Lelouch's Relationship With The Dirimex Partners

Lelouch testified that he knew nothing about Sarria, Melendez, or the other Dirimex partners which suggested that they were drug dealers or drug money launderers. Lelouch Dep., pp. 348–55. Lelouch testified that he knew Sarria as one of the eight to twelve Lima cambistas whom he trusted—on the basis of their reputations and references—to be unwilling to deal in drug dollars. Lelouch stated that he also came to trust Sarria based on the business transactions he carried out with her for the twelve or so months that he dealt with her. However, Lelouch was unable to offer any further or more specific reasons why he trusted the Dirimex partners. Lelouch testified that he "must have asked one or two people [about Sarria], but I can't remember exactly who. But in general the references were good." Lelouch Dep., p. 9.

Lelouch had virtually all of his Dirimex dealings with Sarria. Lelouch met Emilio Melendez only when he became Sarria's partner. Lelouch Dep., p. 66. Lelouch had a few conversations with Melendez and saw him occasionally in connection with the delivery of funds for exchange transactions. *Id.* at 114. The only connection between the Dirimex exchange and drugs that Lelouch admits to knowing was that Mary Aguad's husband was "rumored to have had problems with the law" for the use of cocaine. Lelouch Dep., p. 44–45.[1]

Lelouch also cites the deposition of DEA Agent Kenneth Tanaka, which was taken for a related *All Monies* case. Tanaka was brought into the Melendez investigation to pose as a Japanese customer for Melen-

---

1. The government attempts to bolster their argument that Lelouch should have been suspicious of Dirimex by offering hearsay statements contained in the Declarations of Raymond Byrne and Helmut Groebe. These statements stem from the government investigation of the Melendez drug organization and include the statements of Melendez that he "controlled" the On-

tivero account, and a statement that Sarria's money laundering activities were "well-known." *See* Byrne Declaration, pp. 11–12; Groebe declaration, p. 7. Such evidence is admissible to show probable cause, but is not to be considered in deciding the innocent owner defense. *United States v. Property Known as 6109 Grubb Road, supra*, 886 F.2d at 622.

dez's cocaine shipments.[2] Tanaka testified that the Dirimex exchange was to "all outward intents and purposes a legitimate operation." Tanaka Dep., p. 71. Tanaka admitted that he had no idea whether Melendez' partners in Dirimex were *themselves* aware of Melendez' illegal money laundering activities. *Id.*, p. 104. Tanaka also testified that people who dealt with Dirimex would probably have no reason to believe they were dealing with anything other than a legitimate business. *Id.* at p. 105. Lelouch argues that the large number of legitimate transactions carried out by Dirimex bolsters the Tanaka testimony. *See* spreadsheets of Dirimex transactions, Exhibits B–J attached to Helton Declaration.

Lelouch admits he never asked Sarria or Melendez where their money was coming from, but claims that it would have been futile to do so. Lelouch contends that it is the common practice of Peruvian cambistas to keep their sources secret, for two reasons. First, a cambista who discloses his source can lose it to a competitor. Lelouch Dep., pp. 231–32, 336. Second, cambistas do not inquire into sources of money in order to protect the physical safety of clients and themselves. Lelouch Dep., p. 232, 336. Lelouch gave many examples—from personal experience—of the violence in Lima which can result if personal wealth is not kept secret and the government does not dispute these claims. Thus, Lelouch testified that other cambistas such as Sarria and Melendez are "never going to tell" who their sources are.

The government offers the declaration of Professor Robert Grosse to support its argument that Lelouch should have been suspicious of Dirimex. Grosse is an Associate Professor and Director of the International Business and Banking Institute of the School of Business Administration, University of Miami. Grosse has studied the parallel currency markets of several South American countries, including Peru. It is Grosse's opinion that:

> it was commonly known within the business community in Lima in 1987–89 that narcodollars provided virtually all of the foreign exchange available through the black market in Lima at that time. Thus, a person purchasing dollars on the black market in Lima in that time period would have known, or, at the very least, would have been on notice that he was very likely purchasing the proceeds of narcotics trafficking.

Grosse Declaration at ¶ 16.

▬ Lelouch contends that Grosse's declaration is inadmissable on a motion for summary judgment because they are not made on personal knowledge, do not "set forth such facts as would be admissible in evidence," and do not "show affirmatively that the declarant is competent to testify to the matters stated therein." *See* Fed.R. Civ.P. Rule 56(e); Local Rule 220–7 of the District of Hawaii. Non-compliance with these requirements requires the rejection of affidavits submitted on a summary judgment motion. *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 667 (9th Cir.1980).

### c. The Three Large Dirimex/Ontivero Transactions

Lelouch claims that the three large transactions which the government contends should have made him suspicious were routine and gave him no reason to suspect, at the time, that there was illegal activity involved. Lelouch maintains that nothing about any of the transactions with Dirimex should have made him suspicious. Lelouch testified that between 70 and 80 times per year Lelouch would be offered $500,000 or more in U.S. dollars from cambios with whom he dealt. Lelouch Dep., p. 341. Once or twice a month, he was offered over

---

**2.** The extent of Tanaka's involvement in the investigation, and hence the extent of his personal knowledge about Dirimex, is disputed by the parties. Claimant argues that he had extensive undercover conversations with Melendez and thus had personal knowledge of Dirimex's operation. The government claims Tanaka came into the investigation at the last minute, had no personal knowledge of Dirimex, and, thus, his deposition testimony is inadmissible in regard to the innocent owner defense because it is surmise based on hearsay. It is unnecessary for this Court to reach this issue at this time.

$1 million. *Id.* As discussed earlier, Lelouch contends that the consignment arrangement between Dirimex and Lelouch was not out of the ordinary. *See also* Affidavit of Mohammed Jafri. Lelouch claims he felt "uncomfortable" regarding the large transactions only after he learned of the seizure of his account. Lelouch Dep., pp. 219–23.

### d. Alleged "Control" of Ontivero by Dirimex

The government claims that Dirimex "controlled" Lelouch's Ontivero account. However, much of the evidence the government offers on this point consists of hearsay statements contained in the Declarations of Raymond Byrne and Helmut Groebe. These statements stem from the government investigation of the Melendez drug organization and include the statements of Melendez that he "controlled" the Ontivero account. *See* Byrne Declaration, pp. 11–12; Groebe declaration, p. 10. Those hearsay statements were made by Jaime Ferreyra, the attorney who was representing Sarria and members of the Melendez organization, and by Emilio Melendez.

■ Such evidence is admissible to show probable cause, but is not to be considered in deciding the innocent owner defense. *United States v. Property Known as 6109 Grubb Road, supra,* 886 F.2d at 622. Neither Melendez nor Sarria were signatories on the Ontivero account. Claimant's records indicate that 24 transactions were negotiated with Dirimex during 1988 and 1989. Out of approximately 370 deposits into the Ontivero account in 1988 and 1989, 34 resulted from the 24 transactions between Lelouch and Sarria. Further, not all of the 34 deposits related to Dirimex came from accounts affiliated with tainted sources. Many came from other accounts which the government has not offered any evidence to prove were affiliated with drug trafficking.

There is nonhearsay evidence that may tend to show control of the account by the Dirimex partners, however. Specifically, Lelouch admits that he accepted $500,000 into his Ontivero account on October 4, 1988. Approximately $390,000 of that money was subsequently transferred from the Ontivero account to other accounts of various persons, including four of the claimants in these *All Monies* cases. These disbursements appear in Lelouch's records with the name "EMILIO" next to them. Lelouch admits that the disbursements were done in conjunction with instructions he gave to his bank to disburse the money to people he understood to be Sarria's clients, although he denies knowing there was any illegal activity involved.

### 3. No Summary Judgment On Claimant's Innocent Owner Defense

There is no direct evidence that Lelouch knew the Dirimex exchange was funneling drug proceeds to his Ontivero account. Thus, Lelouch's innocent owner defense turns on whether he has proven by a preponderance of the evidence that he did not "willfully blind" himself and that he did all that reasonably could be expected to prevent his account from receiving tainted money.

■ This Court finds that there exist material issues of fact regarding Lelouch's innocent owner defense. The government has presented circumstantial evidence that makes it questionable whether Lelouch knew or should have known that his account was being used to facilitate the laundering of drug money. Further, it is questionable whether Lelouch did all that could reasonably be expected of him to ensure that illegal use of his account did not occur.

The three sets of large transactions involving Medellin drug cartel money are circumstantial evidence that Lelouch knew or should have known that his account was being used for illegal purposes. Several aspects of those transactions could lead a reasonable person to conclude that Lelouch should have been suspicious about Sarria and Melendez. The instructions received by Lelouch from Sarria and Melendez to receive the money and then subsequently disburse it to various other accounts in smaller quantities could be viewed as suspicious. Similarly, Lelouch offers no expla-

nation for one feature of the October 4 transaction in which Lelouch and Sarria were supposedly simultaneously selling $500,000 that Lelouch took from Sarria on consignment. Lelouch says he sold $110,-000 and later found out that Sarria sold $390,000, implying that there was no further communication between himself and Sarria until after the sales had been completed. Lelouch, however, offers no explanation as to why those two figures coincidentally happen to add up to the exact $500,000 he took on consignment. Moreover, it is unclear why Sarria would "consign" $500,000 to Lelouch, yet continue to attempt to sell such funds to third-party customers.

Further, the fact that all of the relevant bank records were kept in New York, supposedly were not seen by Lelouch, and were subsequently destroyed by Lelouch's wife adds to the suspicious nature of the account. It appears likely that Lelouch would have received information about where the money being deposited into his account was coming from, and it is difficult to believe that, at a minimum, he would not inquire as to those sources telephonically. Finally, the somewhat nebulous answer given by Lelouch when questioned about whether he was violating Peruvian anti-flight capital laws casts doubt on Lelouch's credibility in general.

However, Lelouch has presented evidence that presents an arguably plausible explanation for most, if not all, of the government's evidence. Mohammed Jafri's affidavit asserts that a review of Lelouch's business and account records lead him to conclude that Lelouch was a legitimate money exchanger. Jafri found nothing unusual about the large transactions with Dirimex.

Reasonable persons could disagree about whether Lelouch did all that could be reasonably expected to protect his account from tainted funds. Lelouch testified at his deposition not only to the futility of direct inquiries of sources of funds, but also in detail about why such questions are not asked—protection of business and protection of clients and cambistas from vio-

lence and extortion. Reasonable people could disagree about whether, under those circumstances, Lelouch should have done more than rely on a couple of general references regarding Sarria's and her partners' trustworthiness and a year's worth of business dealing with Sarria. Even assuming that Professor Grosse's testimony is inadmissable, an issue which this Court need not reach at this time, summary judgment should not be awarded for either party.

In sum, reasonable people could disagree about whether Lelouch has sustained his burden of proving by preponderance of the evidence that he was without knowledge of the tainted money, did not consent to the illegal activity, and did all that could reasonably be expected of him to prevent the illegal money from being deposited into his account. Material issues of fact exist as to that burden and, thus, summary judgment should be denied to both parties on the innocent owner issue.

## CONCLUSION

Under government alternative theories 4 and 5, the government has established probable cause that the Ontivero account "facilitated" the illegal activities of the Dirimex group. Thus, probable cause for forfeiture of the entire sum of money, $477,048.62, has been established and summary judgment is entered for the government on that issue.

Summary judgment is denied to both parties with respect to the innocent owner issue. Material issues of fact exist as to whether Lelouch knew or should have known that his account was receiving tainted money or was facilitating illegal activities. Further, material issues of fact exist as to whether Lelouch took all reasonable steps to prevent his account from being used for illegal activities. None of the Court's discussion regarding the innocent owner issue shall constitute findings for the purposes of Fed.R.Civ.P. 56(d).

IT IS SO ORDERED.