18 F.3d 73
 UNITED STATES of America, Plaintiff-Appellee,
v.
UNITED STATES CURRENCY IN the AMOUNT OF ONE HUNDRED
FORTY-FIVE THOUSAND, ONE HUNDRED THIRTY-NINE DOLLARS
($145,139.00) and One Hundred Fifty Dollars ($150.00) in
Travelers Checks, More or Less, Defendants,
Joseph Efiong Etim, Claimant-Appellant.
 No. 965, Docket 92-6252.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 8, 1993.
Decided Feb. 22, 1994.
 
 Daniel F. De Vita, Asst. U.S. Atty., Brooklyn, NY (Mary Jo White, U.S. Atty. for the Eastern Dist. of New York, Robert L. Begleiter, Varuni Nelson, Asst. U.S. Attys., of counsel), for plaintiff-appellee.
 Donald A. Harwood, New York City (Harwood & Neville, on the brief), for claimant-appellant.
 Before VAN GRAAFEILAND, KEARSE and CARDAMONE, Circuit Judges.
 VAN GRAAFEILAND, Circuit Judge:
 Joseph Efiong Etim appeals from a summary judgment of the United States District Court for the Eastern District of New York (Weinstein, J.) declaring $145,139 in currency and $150 in travelers checks forfeited to the United States. See 803 F.Supp. 592 (E.D.N.Y.1992). We affirm.
 
 
 1
 On March 3, 1990, Etim went to the John F. Kennedy International Airport with the intention of boarding a plane that would take him and the above-described funds to Lagos, Nigeria. However, no one was to know about the funds except Etim--they were concealed in boxes of flour. When Etim was informed by a customs agent that he would have to declare any amount in excess of $10,000 that he was carrying, he stated that he was carrying only $80, and he reported that amount on Customs Publication Form 503. When the customs agents searched Etim's luggage, they discovered the concealed money and travelers checks and seized them.
 
 
 2
 Section 5316 of Title 31 United States Code provides in substance that a person who transports more than $10,000 in monetary instruments outside the United States must file a report that contains pertinent information relative to the funds and the person transporting them. Section 5322 of Title 31 prescribes criminal penalties for violations of section 5316. On April 2, 1990, Etim pled guilty to violating sections 5316 and 5322 in that he transported and was about to transport the monetary instruments out of the United States without filing the specific report. He was sentenced to five months imprisonment followed by three years of supervised release, and fined $5,000 plus a special assessment of $50.
 
 
 3
 Section 5317(c) of Title 31 reads in pertinent part as follows:
 
 
 4
 If a report required under section 5316 with respect to any monetary instrument is not filed (or if filed, contains a material omission or misstatement of fact), the instrument and any interest in property, including a deposit in a financial institution, traceable to such instrument may be seized and forfeited to the United States Government.
 
 
 5
 It is a section 5317(c) forfeiture that is at issue herein.
 
 
 6
 Etim's principal contention on appeal, predicated largely on United States v. Halper, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), is that the district court's forfeiture order, which followed his conviction, violated the double jeopardy clause of the Fifth Amendment. We disagree.
 
 
 7
 Because Congress clearly intended a section 5317(c) forfeiture to be civil in nature (see caption to section 1355 of the Anti-Drug Abuse Act of 1986, 100 Stat. 3207-22), " ' "[o]nly the clearest proof" ' that the purpose and effect of the forfeiture are punitive will suffice to override Congress' manifest preference for a civil sanction." United States v. One Assortment of 89 Firearms, 465 U.S. 354, 365, 104 S.Ct. 1099, 1106, 79 L.Ed.2d 361 (1984) (quoting United States v. Ward, 448 U.S. 242, 249, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980) (quoting in turn Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960))). Such proof is lacking herein. "[F]orfeiture is not tied to or dependent upon the wrongdoing of the owner of the monetary instruments." United States v. Six Thousand Seven Hundred Dollars ($6700.00) in United States Currency, 615 F.2d 1, 3 (1st Cir.1980). Indeed, the government is not required to prove in a civil action such as the instant one "that the person who allegedly failed to comply with the reporting requirement of Sec. 5316(a) either had actual knowledge of, or intended 'willfully' to violate, that requirement." United States v. $359,500 in United States Currency, 828 F.2d 930, 934 (2d Cir.1987). In accordance with traditional concepts of forfeiture, Congress has made the undeclared money the culprit. See United States v. McCaslin, 959 F.2d 786, 788 (9th Cir.) ("The proceeding is directed against the property and not at an individual."), cert. denied, --- U.S. ----, 113 S.Ct. 382, 121 L.Ed.2d 292 (1992); see also United States v. $2,490.00 in U.S. Currency, 2,610,000.00 in Mexican Pesos, 825 F.2d 1419, 1420 (9th Cir.1987); United States v. $57,480.05 United States Currency and Other Coins, 722 F.2d 1457, 1458 (9th Cir.1984).
 
 
 8
 We agree with the district court that the property, in this case the currency, was forfeitable because it was an instrument of the crime. It was the "means" by which the crime was committed. See Abel v. United States, 362 U.S. 217, 237, 80 S.Ct. 683, 696, 4 L.Ed.2d 668 (1960) (documents used by illegal alien considered instruments or means for accomplishing illegal status and thus proper subject for search incident to arrest as instrumentalities of crime); Harris v. United States, 331 U.S. 145, 153-55, 67 S.Ct. 1098, 1102-04, 91 L.Ed. 1399 (1947) (cancelled checks could be properly seized as instrumentality and means of crime of forgery; draft cards could be seized as instrumentality and means by which crime is committed when possession of draft cards at issue was itself a crime), overruled on other grounds by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). It was used in perpetrating the crime. See United States v. Rabinowitz, 339 U.S. 56, 64 n. 6, 70 S.Ct. 430, 434 n. 6, 94 L.Ed. 653 (1950) (objects utilized in perpetrating a crime for which an arrest is made are properly subject to seizure and are to be distinguished from mere evidentiary materials), overruled on other grounds by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Indeed, it was the very sine qua non of the crime. See also United States v. United States Currency in Amount of Twenty Three Thousand Four Hundred Eighty One Dollars, ($23,481), More or Less, 740 F.Supp. 950 (E.D.N.Y.1990).
 
 
 9
 Once the offense attaches to the res (here, the currency), ... it is the res that is primarily considered the offender.
 
 
 10
 Id. at 954. Clearly, it is much more accurate to describe the currency as the means by which the crime was committed than it would be to so describe a house from which drugs had been sold or an automobile in which they had been transported. If, as we have held, a house can be considered an instrumentality of the crime, see United States v. Certain Real Property & Premises Known As 38 Whalers Cove Drive, 954 F.2d 29, 36 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992), we would be blinking reality if we held that the money in the instant case was any less an instrumentality. For other cases treating realty as an instrumentality of the crime, see United States v. Cullen, 979 F.2d 992, 994 (4th Cir.1992); McCaslin, 959 F.2d 786. In short, we hold that appellant's reliance on Halper is misplaced. As the court in McCaslin accurately stated:
 
 
 11
 Halper has no application to the very ancient practice by which instrumentalities of a crime may be declared forfeit to the government. The forfeiture of such instrumentalities is " 'independent of, and wholly unaffected by any criminal proceeding in personam.' "
 
 
 12
 Id. at 788 (citations omitted).
 
 
 13
 We recognize quite properly that the flow of money and other goods across the nation's borders is a matter of legitimate, non-prosecutorial concern to the government, which spends substantial sums in regulating such movement. See United States v. Dichne, 612 F.2d 632, 640 (2d Cir.1979), cert. denied, 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980). Forfeiture of goods moving across the border in violation of governmental regulations long has been recognized as enforceable by civil proceedings. One Lot Emerald Cut Stones & One Ring v. United States, 409 U.S. 232, 237, 93 S.Ct. 489, 493, 34 L.Ed.2d 438 (1972) (quoting Helvering v. Mitchell, 303 U.S. 391, 400, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938)). The forfeiture involves the very goods covered by the regulation and it is remedial rather than punitive in nature.
 
 
 14
 There is authority to the effect that double jeopardy can be invoked regardless of whether the prosecution or the forfeiture comes first. See United States v. Amiel, 995 F.2d 367, 370 (2d Cir.1993) (citing United States v. Mayers, 897 F.2d 1126, 1127 (11th Cir.), cert. denied, 498 U.S. 865, 111 S.Ct. 178, 112 L.Ed.2d 142 (1990)). We may expect, therefore, that application of the Halper rule to section 5316 cases would discourage the remedial use of section 5317(c) forfeitures. We doubt that this is what Congress intended or the Constitution requires.
 
 
 15
 We find no merit in Etim's claim of an Eighth Amendment violation based on an alleged excessive fine. Putting aside the question whether the forfeiture should be considered a fine, it clearly was not excessive. Section 5321(a)(2) of Title 31 provides that the Secretary of the Treasury may impose a civil penalty on a person not filing a report that "may not be more than the amount of the monetary instrument for which the report was required." The section continues: "A civil penalty under this paragraph is reduced by an amount forfeited under section 5317(b) [now section 5317(c) ] of this title." Congress clearly intended that the liability for failure to declare, whether by forfeiture or fine, can be equal to the amount of the monetary instrument involved. Moreover, the Secretary is empowered to remit any portion of the forfeiture or civil penalty that he deems proper. Section 5321(c); see United States v. Huber, 603 F.2d 387, 397 (2d Cir.1979) (discussing district court's power to reduce award under 18 U.S.C. Sec. 1963), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); see also Halper, 490 U.S. at 446, 109 S.Ct. at 1900 (quoting One Lot Emerald Cut Stones, 409 U.S. at 237, 93 S.Ct. at 493).
 
 
 16
 We likewise reject appellant's claim of unconscionable delay. The currency involved herein was seized by the government on March 3, 1990, and the forfeiture action was begun on December 13, 1991, twenty-one months later. However, three days after the currency was seized, the Customs Service informed Etim by letter that he had the right to petition for return of the currency and instructed him concerning the information to be included in the petition. Approximately one month thereafter, Etim's attorney informed the Service by letter that Etim wanted to recover the funds, but the attorney did not send the information that the Service required for return of the funds. Neither did he seek a judicial hearing to require either the return of the funds or the institution of a foreclosure proceeding. The district court measured the delay by the four-part test of Barker v. Wingo, 407 U.S. 514, 530-33, 92 S.Ct. 2182, 2192-93, 33 L.Ed.2d 101 (1972), as adopted by the Supreme Court in United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in United States Currency, 461 U.S. 555, 564-65, 103 S.Ct. 2005, 2012, 76 L.Ed.2d 143 (1983), and concluded that the delay was not unreasonable. See 803 F.Supp. at 600-01. There was no error here.
 
 
 17
 The judgment of the district court is affirmed.
 
 KEARSE, Circuit Judge, dissenting:
 
 18
 I respectfully dissent. I do not see a civil purpose in the present forfeiture; I am not persuaded that money that may have been lawfully acquired and may be lawfully possessed becomes an "instrumentality of crime" simply because its possession is not reported. Accordingly, I am unable to conclude that this forfeiture proceeding pursuant to 31 U.S.C. Sec. 5317(c) (1988) against Joseph Efiong Etim, who had already been prosecuted and punished for the failure to report, did not violate the Double Jeopardy Clause.
 
 
 19
 Congress may, consistent with the Double Jeopardy Clause, impose both criminal and civil sanctions with respect to the same act or omission. See, e.g., United States v. Halper, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989); United States v. One Assortment of 89 Firearms, 465 U.S. 354, 359, 104 S.Ct. 1099, 1103, 79 L.Ed.2d 361 (1984); Helvering v. Mitchell, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938). A forfeiture proceeding may be either civil or criminal. If designed to effect deterrence or to exact retribution, it should be deemed a criminal penalty, for " 'retribution and deterrence are not legitimate nonpunitive governmental objectives.' " United States v. Halper, 490 U.S. at 448, 109 S.Ct. at 1902 (quoting Bell v. Wolfish, 441 U.S. 520, 539, n. 20, 99 S.Ct. 1861, 1874, n. 20, 60 L.Ed.2d 447 (1979)). "Civil forfeitures do not retain their civil character if they are used in order to achieve deterrence or retribution." United States v. Certain Real Property & Premises Known As 38 Whalers Cove Drive, 954 F.2d 29, 36 (2d Cir.) ("Whalers Cove Drive "), cert. denied, --- U.S. ----, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992). A penalty denominated as civil should also be characterized as punitive if it "bears no rational relation to the goal of compensating the Government for its loss." United States v. Halper, 490 U.S. at 449, 109 S.Ct. at 1902.
 
 
 20
 If a proceeding is criminal in nature, it may not, consistent with the Double Jeopardy Clause, be pursued in addition to a criminal prosecution. For purposes of double jeopardy analysis, resolution of whether a forfeiture proceeding is intended to be, or by its nature necessarily is, criminal and punitive, rather than civil and remedial, begins with statutory interpretation. United States v. One Assortment of 89 Firearms, 465 U.S. at 362, 104 S.Ct. at 1105; Helvering v. Mitchell, 303 U.S. at 399, 58 S.Ct. at 633; see also United States v. Ward, 448 U.S. 242, 248, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980) (same inquiry with respect to applicability of Fifth Amendment privilege against self-incrimination). We are to attempt to determine first whether, in establishing the sanctioning mechanism, Congress has indicated, expressly or impliedly, a preference for one classification or the other. If Congress has indicated an intention to classify the penalty as civil, we must then determine whether the statutory scheme is so punitive in effect as to offset that intention. United States v. One Assortment of 89 Firearms, 465 U.S. at 362-63, 104 S.Ct. at 1105; United States v. Ward, 448 U.S. at 248, 100 S.Ct. at 2641. Only the clearest proof that the effect of a forfeiture is punitive will suffice to override Congress's explicit or implicit assumption that the sanction it created was civil. See United States v. One Assortment of 89 Firearms, 465 U.S. at 365, 104 S.Ct. at 1106; United States v. Ward, 448 U.S. at 249, 100 S.Ct. at 2641; Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960); see also Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 567-68, 9 L.Ed.2d 644 (1963) (setting out principal considerations informing such an analysis).
 
 
 21
 The provisions at issue in the present case are found in Subchapter II of Chapter 53 of Title 31, 31 U.S.C. Secs. 5311-5328 (1988) ("Subchapter II"), which is entitled "Records and Reports on Monetary Instruments Transactions." The provisions of Subchapter II are designed to "require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." Id. Sec. 5311. In furtherance of this objective, Sec. 5316 provides, with one exception not material here, that
 
 
 22
 a person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly--
 
 
 23
 (1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time--
 
 
 24
 (A) from a place in the United States to or through a place outside the United States.
 
 
 25
 . . . . .
 
 
 26
 31 U.S.C. Sec. 5316(a)(1)(A); see also id. Sec. 5316(a)(1)(B) (requiring report with respect to transportation of such sums "to a place in the United States from or through a place outside the United States"). Subsection (b) of Sec. 5316 outlines the disclosures that the Secretary of the Treasury ("Secretary") may require in such a report, including the monetary instruments' origin, owner, and intended recipient.
 
 
 27
 Subchapter II provides for criminal penalties, civil penalties, and forfeiture. Section 5322, under which Etim was convicted, provides, in pertinent part, that[a] person willfully violating this subchapter or a regulation prescribed under this subchapter ... shall be fined not more than $250,000, or imprisoned for not more than five years, or both.
 
 
 28
 Id. Sec. 5322(a). Section 5322(b) doubles the maximum penalties for a person who willfully committed such a violation "while violating another law of the United States." Id. 5322(b). Section 5317, under which the present action was brought, provides, in pertinent part, that
 
 
 29
 [i]f a report required under section 5316 with respect to any monetary instrument is not filed (or if filed, contains a material omission or misstatement of fact), the instrument and any interest in property ... traceable to such instrument may be seized and forfeited to the United States Government.
 
 
 30
 Id. Sec. 5317(c).
 
 
 31
 Section 5321 principally prescribes what is described as "a civil penalty" of up to $100,000 for a domestic financial institution, its principals, officials, or employees, for "willfully violating" a provision of Subchapter II. Id. Sec. 5321(a)(1). The section goes on to provide that
 
 
 32
 [t]he Secretary of the Treasury may impose an additional civil penalty on a person not filing a report, or filing a report containing a material omission or misstatement, under section 5316 of this title or a regulation prescribed under section 5316. A civil penalty under this paragraph may not be more than the amount of the monetary instrument for which the report was required. A civil penalty under this paragraph is reduced by an amount forfeited under section 5317(b) [sic ] of this title.
 
 
 33
 Id. Sec. 5321(a)(2). (Since Sec. 5317(b) deals with border searches rather than with forfeiture, reference to Sec. 5317(c) seems to have been intended.) Subsection (c) of Sec. 5321 provides that
 
 
 34
 [t]he Secretary may remit any part of a forfeiture under subsection (c) ... of section 5317 of this title or civil penalty under subsection (a)(2) of this section.
 
 
 35
 Id. Sec. 5321(c). Subsection (d) provides that
 
 
 36
 [a] civil money penalty may be imposed under subsection (a) with respect to any violation of this subchapter notwithstanding the fact that a criminal penalty is imposed with respect to the same violation.
 
 
 37
 Id. Sec. 5321(d).
 
 
 38
 The substance of some of these sections, singly and in combination, may suggest that Congress viewed forfeiture as, at least in part, a civil penalty. It does not appear, for example, that forfeiture was envisioned as being an integral part of a criminal prosecution, for Sec. 5321(c) gives the Secretary an apparently unfettered discretion to remit a portion of the Sec. 5317(c) forfeiture. Such discretion is not generally granted with respect to criminal fines obtained through criminal prosecution, for the Criminal Code permits only the court to reduce such a fine. See 18 U.S.C. Sec. 3572(d) (1988) (requiring that criminal fines be paid immediately unless court otherwise orders); id. Sec. 3573 (permitting government to petition sentencing court to remit all or part of a fine only upon a "showing that reasonable efforts to collect ... are not likely to be effective"). In addition, though 31 U.S.C. Sec. 5321(d) states that a civil money penalty may be imposed notwithstanding the imposition of a criminal penalty with respect to the same violation, Sec. 5321(a)(2) states that any civil penalty must be reduced by the amount of a forfeiture. That mandated reduction, viewed in light of the notwithstanding-any-criminal-penalty provision, may imply that Congress did not view forfeiture as a criminal penalty.
 
 
 39
 On the other hand, there are indications that Congress viewed forfeiture as more than a civil penalty. For example, the penalties set out in Sec. 5321 are, in virtually every sentence, explicitly denominated "civil." Section 5317, the forfeiture section, nowhere uses the term "civil." Had the forfeitures been viewed as strictly civil, one would have expected that characterization to be included in Sec. 5317 as well as in Sec. 5321.
 
 
 40
 Moreover, the amount of any "civil" penalty for failure to report is expressly limited in Sec. 5321(a) to an amount "not to exceed $100,000." The amount forfeitable under Sec. 5317, however, can exceed the amount that could be assessed as a civil penalty, for the amount forfeitable is limited only by the value of the unreported instruments. Further, it is notable that in Sec. 5317 there is no express provision, to parallel the one in Sec. 5321(d) with respect to Sec. 5321(a)'s "civil" penalties, authorizing a forfeiture to be imposed notwithstanding the prior imposition of a criminal penalty for the same violation. Congress's silence as to any intent to authorize the combination of criminal prosecution plus forfeiture, in contrast to its express provision for the combination of criminal punishment plus those penalties it denominated "civil," may well indicate that Congress viewed the Sec. 5317 forfeiture as a sanction that is criminal in nature.
 
 
 41
 Indeed, in light of the detailed provision for civil penalties in Sec. 5321, unless the loss to the government exceeds the civil penalty ceiling imposed by that section, it is hardly clear what civil purpose Sec. 5317 forfeiture would have. The most common purposes of civil remedies are (1) compensation for past losses, which might include the cost of enforcement, (2) coercion to compel the target's compliance with legal directives, and (3) correction or prevention of inappropriate conditions. The forfeiture sanction provided by Sec. 5317 does not appear to fit into any of these categories.
 
 
 42
 The first purpose, compensation, does not appear to be applicable because the forfeiture is not limited to the extent of any loss. Section 5317 provides for forfeiture of the entire unreported monetary instrument or any property derived from it. Though the Secretary may, if he wishes, remit part of the property forfeited, the forfeiture itself operates on the entire value of the unreported instrument without regard to any cost or loss to the government. Further, though the government incurs some expense in prosecuting and punishing a person who has failed to file the required report, that expense seems likely to be modest. In the criminal prosecution of Etim, for example, though Sec. 5322(a) allows a fine of up to $250,000, the sentencing court expressly took into account the cost to the government of prosecution, including confinement, and set the amount of Etim's fine at just $5,000. It seems unlikely that the government could show additional injury that is 28 times the cost of prosecution and imprisonment.
 
 
 43
 Nor does a forfeiture for failure to report appear to be designed to compel compliance. Forfeiture under Sec. 5317 comes into play only after the government has learned of the transport of the funds; there is no need to compel a report of that fact. Indeed, there is nothing in the statute that would preclude a forfeiture even where the government had learned all of the information that it would have received in a properly made report. Further, even if the government had learned only of the funds' transport and had not gained any information as to their provenance, ownership, or intended recipient, the forfeiture is not designed to obtain that information. A forfeiture decree is not an order that by its terms deprives the target of funds for only so long as he refuses to provide the desired information. Nor is the deprivation one that the target himself has the power to abate by providing the information, for a subsequent disclosure may not lead to relief from the forfeiture since any remission lies solely in the Secretary's discretion. Thus, the forfeiture order has neither of the principal characteristics of a traditionally coercive device such as civil contempt. See generally Shillitani v. United States, 384 U.S. 364, 368, 86 S.Ct. 1531, 1534, 16 L.Ed.2d 622 (1966) (distinguishing between civil and criminal contempt orders); Yates v. United States, 355 U.S. 66, 74, 78 S.Ct. 128, 133, 2 L.Ed.2d 95 (1957) (same); United States v. United Mine Workers, 330 U.S. 258, 299, 67 S.Ct. 677, 698-99, 91 L.Ed. 884 (1947) (same); Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 441-42, 31 S.Ct. 492, 498-99, 55 L.Ed. 797 (1911) (same); see also Simkin v. United States, 715 F.2d 34, 36-37 (2d Cir.1983) (civil contempt order that has lost any coercive potential becomes punitive and must be vacated).
 
 
 44
 The third civil purpose, correction or prevention of an undesirable condition, was essentially the purpose relied on by the district court, which characterized transported unreported funds as a crime "instrumentality" that the government could properly, as a civil matter, remove from general circulation. I disagree with this characterization. The traditional approval of the government's removal of "instrumentalities" of crime "spring[s] from the historic fiction ... that 'an instrument of harm is itself culpable.' " Whalers Cove Drive, 954 F.2d at 35. It is plain, however, that the statutory scheme set out in Subchapter II does not make, and was not intended to make, the money itself contraband or the possession or transport of the money culpable. See, e.g., H.R.Rep. No. 91-975, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Admin. News 4394, 4398 (Statute "imposes no legal limitation on the export of U.S. currency from the United States to foreign jurisdictions. Those leaving the United States have always been free to take with them such amounts of cash or other forms of money as they choose."). The reporting requirement applies whether or not the funds are the proceeds of unlawful activity, whether or not they are designed to be used in such activity, whether or not they are lawfully possessed, and whether or not any applicable taxes have been paid. Indeed, the applicability of the reporting requirement to money that has been lawfully earned, taxed, and possessed is underscored by the fact that Sec. 5322(b) doubles the criminal penalties for failure to report "while violating another law of the United States."
 
 
 45
 Further, though it is true that possession of the funds is a precondition to the applicability of the Sec. 5316 reporting requirement, not all preconditions are instrumentalities. For example, if an alien seeking a visa for entry into the United States failed to disclose that he had children or that he was afflicted with a significant communicable disease, see 8 U.S.C. Secs. 1182, 1202 (1988), thereby exposing himself to criminal penalties under id. Sec. 1325, one could hardly call his children or his disease an instrumentality of the crime. Or if a corporate officer failed to report his lawful acquisition of a significant number of his company's shares as required by Sec. 16(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78p(a) (1988), thereby exposing himself to criminal penalties under 15 U.S.C. Sec. 78ff, I would not say that his failure to report made those shares an instrumentality of the crime. Nor, if an individual lawfully earned taxable income but willfully failed to file a tax return, thereby violating provisions of the Internal Revenue Code, would I describe the lawfully earned but unreported income as an instrumentality of the crime. Since an "instrumentality" is a means of doing something, it would seem that a crime of pure omission (not to be confused with an affirmative act of concealment) would have no "instrumentality," for the offense is not doing something but doing nothing. The traditional fiction of "instrumentality" takes on a surreal quality if the crime is a failure to report, and the unreported item itself, whose existence and presence may be entirely innocent and harmless, is characterized as "culpable" or as a "harmful object" simply because its existence has not been disclosed. I would conclude that where the target of forfeiture is not itself a means but is merely an item whose existence triggers the applicability of a requirement to report, the "instrumentality" analysis is inapposite.
 
 
 46
 In sum, Congress has provided no explicit guidance as to whether it deemed the Sec. 5317 forfeiture to be civil or criminal, and I am unable to divine, either from the statute itself or from its scant legislative history, which does not focus on this question, even an implicit assumption that such a forfeiture was to serve solely civil purposes. Rather than effecting compensation, correction, or coercion, a forfeiture under Sec. 5317 primarily visits retribution on the transporter of the funds for not having supplied the desired information, and acts as a potential deterrent to others who would similarly fail to report. These are typically criminal, not civil, purposes.
 
 
 47
 In light of these purposes, and in light of the fact that the $5,000 criminal fine imposed on Etim was calculated with reference to the expense of prosecution, I see no civil purpose to the $145,000 forfeiture, and I would conclude that the forfeiture proceeding violated his right to be free from double jeopardy.