UNITED STATES of America, Plaintiff,

v.

ACCOUNT NO. 50–2830–2, LOCATED AT FIRST BANK, 814 EAST MAIN STREET, ROANOKE, ALABAMA, AND ALL MONIES DEPOSITED THEREIN, Defendant.

Civ. A. No. 91–D–689–E.

United States District Court,
M.D. Alabama,
Eastern Division.

March 1, 1995.

John T. Harmon, Asst. U.S. Atty., Montgomery, AL, for plaintiff.

Carl Michael Siebert, Huntsville, AL, for claimant.

E.E. Edwards, III, Nashville, TN, for defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

A hearing on the above-styled action was held on September 26, 1994. The United States of America contends that the currency at issue is the *corpus delicti* of "structuring." The United States avers that the subject financial institution and Dr. Richard T. Lowe, the depositor of the subject currency, colluded to evade the reporting requirement on a certain financial transaction. Consequently, the Government claims that the currency involved in said transaction is subject to forfeiture. Claimant Dr. Richard T. Lowe contends that none of the Defendant funds are lawfully subject to forfeiture because he, himself, was under no duty to report the subject transaction.

### Jurisdiction & Venue

Subject matter jurisdiction is proper under 28 U.S.C. § 1331, as the United States of America contends that Claimant violated 31 U.S.C. §§ 5313 and 5324 and asserts that forfeiture of subject personal property is appropriate under 18 U.S.C. § 981.[1] Personal jurisdiction and venue are not contested.

### Facts/Contentions

The facts are not in serious dispute. On June 20, 1991, the United States of America filed this civil action against the defendant account to enforce the provisions of 18 U.S.C. § 981(a)(1) for the forfeiture of property involved in a transaction or attempted transaction in violation of 31 U.S.C. §§ 5313 and 5324. Dr. Richard T. Lowe (hereinafter "Dr. Lowe"), the depositor of the subject funds, is the claimant.

In an effort to aid Chambers Academy, a private school located in the claimant's hometown of LaFayette, Alabama, Dr. Lowe during February 1988 placed the proceeds of several Certificates of Deposit (hereinafter "CD"), which were in the form of certified checks, in a one year CD at the First Bank of Roanoke, Alabama. The interest on the approximately $1,307,000 in the CD went directly to the Chambers County Educational Foundation (hereinafter, "CCEF"), an organization established to benefit Chambers Academy. Dr. Lowe's name was not placed on the account in any way because he wished to remain anonymous, seeking to benefit the school without receiving any public recognition. Dr. Lowe continued to add to the amount on deposit in the CCEF account, and by the beginning of 1991, approximately $2.8 million dollars, in the form of numerous CDs, were on deposit in the name of CCEF.

Claimant asserts that during the four years that Chambers Academy received interest on his funds he engaged in frequent conversations with Lex Walton, Jr. and John Lane Perry about the financial condition of the school, improvements needed by the school, and the manner in which the funds were being used. Dr. Lowe concedes that he

---

1. Pursuant to 28 U.S.C. § 1331, the federal district courts have "original jurisdiction of all civil actions arising under the.... laws.... of the United States."

had conversations with Scott Langley, chairman of the CCEF Board of Directors, and occasionally attended board meetings. While Claimant contends that he did not control the manner in which the money was used, he made suggestions regarding the appropriate use of the funds.

In the fall of 1990, Dr. Lowe decided to deposit a large amount of cash, which he had on hand at his home,[2] in a CD in the name of CCEF.[3] In October 1990, Dr. Lowe contacted Mr. Joseph Lett (hereinafter "Lett"), a long-time friend and President of First Bank of Roanoke, and told him that he had approximately $60,000[4] in cash which he would like to deposit. After arrangements for Mr. Lett and his wife to pick up the money at Dr. Lowe's home fell through, on November 14, 1990, Dr. Lowe, Mrs. Lowe, and their daughter loaded the boxes of money in their car to transport them to Mr. Lett at First Bank. On the way to Roanoke, Dr. Lowe's car became mechanically disabled, and it was after banking hours when the Lowes arrived in Roanoke. According to his brief, Dr. Lowe then obtained directions to Mr. Lett's home. After arriving at the Lett home somewhere between the hours of eight and nine o'clock in the evening, Mr. Lett accepted the money and issued Dr. Lowe a typewritten receipt for the deposit.

Mr. Lett received a total amount in cash of $317,520. The expenses incurred from counting the cash and the expenses incurred from having Dr. Lowe's car towed to Haleyville totalled $690. Therefore, the net deposit and the amount that the court will refer to throughout its opinion is $316,911. Instead of directly depositing the money into the bank, Mr. Lett made numerous purchases of cashier's checks in amounts lower than $10,000. According to Dr. Lowe, Mr. Lett handled the cash in this way to preserve Dr. Lowe's anonymity. Evidently, Dr. Lowe's anonymity was to be preserved by having Mr. Lett deposit the amounts in increments of less than $10,000.[5] Consequently, no currency transaction report (hereinafter "CTR") was filed covering the $316,911 deposit. This is the transaction upon which the United States bases its action to forfeit the defendant currency in the amount of the deposit, plus interest. The United States, through its attorney(s), claims that the currency in the amount of $316,911 is subject to forfeiture because the currency is the *corpus delicti* of the "structuring."[6]

**2.** Dr. Lowe was a child during the Great Depression of the 1930's. As a result of the strong impression the hardships of those years made on him, he evidently never completely regained his trust in banks. Consequently, from the beginning of his working life, he saved cash and kept it in boxes in his home. In 1990 after many years of saving cash in this manner, Mrs. Lowe became concerned about keeping so much cash on hand, due to the threat of theft and the possibility of fire loss. At her prodding, Dr. Lowe agreed to deposit the money in the bank.

**3.** Claimant posited other reasons for his desire to remain anonymous. First, Dr. Lowe claims that anonymity advanced the security and safety of his family. According to Dr. Lowe, he is concerned about the consequences of being known as a rich doctor because he has noticed news accounts involving the kidnapping of wealthy physicians and business persons' children.

Next, Claimant contends that common knowledge regarding him and his professional affiliation would subject him to meritless lawsuits. Dr. Lowe asserts that it has been his experience that some people are impelled to seek and file frivolous malpractice actions against physicians, especially those enjoying affluent lifestyles.

**4.** In a later conversation, Dr. Lowe told Mr. Lett that the money could total over $100,000. (J. Lett dep. at 49.) It was not until Mrs. Lowe finished counting the money and tabulating the bundles of cash that the Lowes realized the total exceeded $300,000. Mrs. Lowe's calculations determined that the cash amounted to $315,291, which the bank later found to be in error. First Bank determined that the total should be $317,520, excluding $609, which, as noted above, covered the cost of the bank counting the money and the cost of having Dr. Lowe's car towed back to Haleyville after it became disabled.

**5.** The act of fractionalizing large sums of money into discreet increments of less than $10,000 is known as "structuring."

**6.** In its order of June 23, 1994, the court granted summary judgment in favor of Defendant Account No. 50–2830–2, 857 F.Supp. 1534. However, the court denied Defendant's motion for summary judgment as to the $316,911 for which no CTR was filed. This is the currency presently at issue.

### Discussion & Analysis

■ The United States seeks forfeiture of the defendant currency pursuant to 18 U.S.C. § 981(a)(1)(A). This provision authorizes forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 5313(a) or 5324(a) of Title 31." Section 5324(a) of Title 31 provides, in pertinent part, that:

No person shall for the purpose of evading the reporting requirements of section 5313(a) [7] with respect to such transaction—

(1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a);

\*    \*    \*    \*    \*    \*

(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

31 U.S.C. § 5324(a). Thus, the statute prohibits the attempt by an individual to cause a financial institution to disregard the mandates of section 5313, which requires banks and other financial institutions to comply with such reporting requirements for cash transactions as the Secretary of the Treasury (the "Secretary") shall establish. The Secretary has determined that "[e]ach financial institution.... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,-000." 31 C.F.R. § 103.21.

■ Before forfeiture will lie under 981(a), the government must demonstrate probable cause to believe that the seized property was involved in the structuring [8] of deposits to avoid the filing of a CTR in

violation of 31 U.S.C. § 5313(a). In order to establish probable cause, the government must have reasonable grounds to believe the account is subject to forfeiture. *See United States v. All Funds on Deposit in Great Eastern Bank Acct. No. 11008117,* 804 F.Supp. 444, 446 (E.D.N.Y.1992) (citing *United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1160 (2d Cir.1986)). The United States establishes probable cause by demonstrating a "reasonable ground for belief of guilt, supported by prima facie proof, but more than reasonable suspicion." *United States v. $705,270.00 in U.S. Currency,* 820 F.Supp. 1398 (S.D.Fla.1993) (quoting *United States v. One Parcel of Real Estate,* 963 F.2d 1496, 1501 (11th Cir.1992)). "Probable cause exists when the aggregate of facts gives rise to more than a mere suspicion that the property was involved in or intended to be involved in the illegal activity; the presence or absence of any single fact is not dispositive." *United States v. All Monies ($477,048.62) in Acct. 90–3617–3,* 754 F.Supp. 1467, 1471 (D.Hawaii 1991).

In *United States v. $705,270.00 in U.S. Currency,* 820 F.Supp. 1398 (S.D.Fla.1993), the court found that the government possessed sufficient probable cause to seize funds in violation of § 5313(a). To substantiate its finding, the court in *$705,270.00 in U.S. Currency* stated:

[t]he undisputed facts reveal that Franco (the claimant) exchanged Columbia pesos for the defendant currency through a currency exchange house ... and that the exchange house delivered the defendant currency to Franco's agent.... It is also undisputed that a currency transaction report was not filed regarding the transfer of the defendant currency. Therefore, proba-

---

7. 31 U.S.C.A. § 5313(a) provides:

(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

31 U.S.C.A. § 5313(a).

8. The process of structuring transactions to avoid the $10,000 reporting threshold is also referred to as "smurfing." According to legal commentary, the nickname is descriptive of "[t]he army of persons who scurried from bank to bank to accomplish these transactions became known as "smurfs" because, like their little blue cartoon namesakes, they were pandemic." Sarah N. Welling, *Smurfs, Money Laundering, and the Federal Criminal Law: The Crime of Structuring Transactions,* 41 U.Fla.L.Rev. 287, 287 (1989).

ble cause of a section 5313(a) violation exists if the exchange house used by Franco is a financial institution required to comply with 31 U.S.C. § 5313.

*$705,270.00 in U.S. Currency,* 820 F.Supp. at 1401. As can be ascertained from the foregoing excerpt, the *$705,270.00 in Currency* court did not mention the activity of the claimant when determining whether the government established sufficient probable cause to seize the currency.[9] The court found sufficient probable cause because Claimant Franco's actions involved a financial institution which was required to file a CTR and the requisite CTR had not been executed.

■ In the action at bar, it is not controverted that First Bank failed to file the requisite CTR. Neither is it disputed that Plaintiff expressed a desire to remain anonymous. (Joseph Lett Supp. Affidavit, at ¶ 5). Moreover, Mr. Lett stated that Lowe's desire to remain anonymous, at least in part, impelled First Bank's decision to engage in the surreptitious inter-bank and intra-bank networking which produced the structuring scheme at issue. (Joseph Lett Supp. Affidavit, ¶ 8).[10] Given that Claimant requested to remain anonymous and First Bank failed to file the requisite CTR, due, at least in part, to the behest of Claimant, the court finds that the United States possessed sufficient probable cause to seize the defendant currency.

■ Once, as here, the Government establishes probable cause, the burden shifts to the claimant to demonstrate by a preponderance of the evidence that the defendant currency, is not subject to forfeiture. *United States v. $705,270.00 in Currency,* 820 F.Supp. at 1401. If the claimant fails to rebut the plaintiff's showing of probable cause, the plaintiff prevails. *See United States v. 1988 Oldsmobile Supreme,* 983 F.2d 670, 675 (5th Cir.1993) (quoting *United States v. Little Al,* 712 F.2d 133, 136 (5th Cir.1983)) ("[i]f unrebutted, a showing of probable cause alone will support a forfeiture"); *United States v. One 1987 Mercedes 560 SEL,* 919 F.2d 327, 331 (5th Cir.1990) (failure to refute the government's showing results in forfeiture).

Dr. Lowe contends that forfeiture of the entire defendant account would violate the Excessive Fines Clause of Amendment VIII to the United States Constitution.[11] Claimant contends that since the United States Supreme Court has enunciated a heightened scrutiny of the government's forfeiture practices under 21 U.S.C. §§ 881(a)(4) and (a)(7), it logically follows that the government's action in the instant case should be subjected to an Eighth Amendment analysis. *See Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); *Alexander v. United States,* —— U.S. ——, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993). Claimant cites *United States v. Taylor,* 13 F.3d 786 (4th Cir.1994) in support of his contention that forfeiture under 18 U.S.C. § 981 compels an Eighth Amendment analysis.

In *Taylor,* the court determined the issue of whether the forfeiture of a residence used to facilitate unlawful drug transactions warranted an Excessive Fines Clause (Eighth Amendment) analysis when said forfeiture was executed pursuant to 18 U.S.C. § 981. After adopting the reasoning employed by the United States Supreme Court in *Austin,*[12] the *Taylor* court held that the Excessive Fines Clause was implicated by the action against the defendant property. *United States v. Taylor,* 13 F.3d at 790. The court

---

9. Claimant Lowe asserts that there is not a firm nexus between himself and the structuring activity. However, as alluded to earlier, the requisite standard for determining whether probable cause exists is objective in nature; therefore, the court must look at the totality of the circumstances surrounding the seizure of the defendant funds.

10. Joseph Lett stated, "I simply wanted to do what I could to maintain his (Dr. Lowe's) anonymity." (Joseph Lett Supp. Affidavit, ¶ 8) (parenthesis and enclosed material added).

11. "Excessive bail shall not be required, nor excessive fines imposed ..." U.S. Const., Amendment VIII.

12. The *Austin* Court reasoned that Congress demonstrated an intent that forfeiture under 21 U.S.C. § 881 meet a punitive objective by "tying forfeiture directly to the drug offenses" and through express statements in the legislative history accompanying passage of section 881. *Austin,* —— U.S. at ——, 113 S.Ct. at 2811.

finds that the cases cited by Claimant are factually distinguishable from the case at bar in at least one material respect. All cases relied on by Claimant involve property employed in drug-related activities and none address the issue of whether or not the forfeiture of property, which is, concomitantly, the very medium of committing the unlawful act and the precise substance of the unlawful act, violates the Excessive Fines Clause of the United States Constitution.

■ In *United States of America v. United States Currency in the Amount of One Hundred Forty–Five Thousand, One Hundred Thirty–Nine Dollars ($145,139.00) and One Hundred Fifty Dollars ($150.00) in Travelers Checks, More or Less*, 18 F.3d 73 (2nd Cir.1994), the court held that the defendant currency was forfeitable because it was the instrument of the crime (i.e. the "means" by which the crime was committed). *Currency in the Amount of $145,139*, 18 F.3d at 75 (citing *Abel v. United States*, 362 U.S. 217, 237, 80 S.Ct. 683, 696, 4 L.Ed.2d 668 (1960)). In *Currency in the Amount of $145,139*, the court reasoned that the money "used in perpetrating the crime" was the very *sine qua non* of the crime. *Id.* The court further noted that if a house may be considered an instrumentality of the crime,[13] it would constitute blinking reality to hold that money in

the case before it was any less an instrumentality.[14] *Id.*

In *Currency in the Amount of $145,139*, the claimant, Joseph Efiong Etim, violated 31 U.S.C. §§ 5316 and 5322 by failing to file the requisite report before attempting to leave the country with greater than $10,000 in currency. Section 5316 makes it unlawful for a person to transport, internationally, more than $10,000 in monetary instruments without filing a report that contains important information concerning the funds and the individual transporting them.[15]

The court also deems it noteworthy that in *Currency in the Amount of $145,139* the court noted that the forfeiture of funds in that case did not constitute an excessive fine. The court held that because the government sought forfeiture of no more than the funds involved in the transaction subject to reporting, said forfeiture was not excessive. *Currency in the Amount of $145,139*, 18 F.3d at 76.

■ The court finds that § 5316 and § 5313 are in *pari materia.* Both provisions place reporting requirements on deposits of currency in amounts equal to or greater than $10,000. Moreover, section 5324 is common to both provisions.[16] The sole material vari-

---

**13.** The *Currency in the Amount of $145,139* court also noted that where the offense attaches to the *res*, the currency, it is the *res* that is primarily deemed the offender. *Currency in the Amount of $145,139*, 18 F.3d at 75 (citing *United States v. United States Currency in the Amount of Twenty–Three Thousand Four Hundred Eighty–One Dollars*, 740 F.Supp. 950, 954 (E.D.N.Y.1990)).

**14.** Essentially, the *Currency in the Amount of $145,139* court makes the same point as the United States does here—that the currency at issue is the *corpus delicti* of the wrongdoing. Since the currency has this characterization, forfeiture is not unjust.

**15.** The claimant in *Currency in the Amount of $145,139*, triggered the forfeiture provision found in section 5317(c). Section 5317(c) of Title 31 provides in relevant part that:

[i]f a report required under section 5316 with respect to any monetary instrument is not filed (or if filed, contains a material omission or misstatement of fact), the instrument and any interest in property, including a deposit in a financial institution, traceable to such instru-

ment may be seized and forfeited to the United States Government.

**16.** Section 5324 of Title 31 provides:

(a) **Domestic coin and currency transactions—** No person shall for the purpose evading the reporting requirements of section 5313(a) ... or the regulations issued thereunder ... with respect to such transaction—
  (1) cause or attempt to cause a financial institution to fail to file a report required; under section 5313(a) ...;
  (2) ....; or
  (3) structure or assist in structuring, any transaction with one or more domestic financial institutions.
(b) **International monetary instrument transactions**—No person shall, for the purpose of evading the reporting requirements of section 5316—
  (1) fail to file a report required by section 5316, or cause or attempt to cause a person to file such a report;
  (2) ....;
  (3) structure or assist in structuring, or attempt to structure or assist in structuring,

ance regarding the two sections is that one pertains to reporting in which funds are transported internationally, § 5316, and the other concerns domestic transactions, § 5313. Therefore, the court concludes that not only is the forfeiture of the defendant money not violative of the Excessive Fines Clause of the United States Constitution, but the action is not amenable to Eighth Amendment scrutiny, so long as the amount forfeited is no more than the defendant currency.

■ Claimant also argues that the subject currency is not subject to forfeiture because he is an "innocent owner." The innocent owner defense is available to persons who have no knowledge of illegal activity involving their property.* The Eleventh Circuit Court of Appeals has stated that "the innocent owner defense turns on the claimant's actual knowledge." *United States v. One Single Family Residence Located at 6960 Miraflores Avenue,* 995 F.2d 1558, 1561 (11th Cir.1993); *United States v. Real Property at 5000 Palmetto Drive,* 928 F.2d 373, 375 (11th Cir.1991). Joseph Lett contends that Dr. Lowe had no knowledge of the unlawful omission executed by First Bank's personnel. Joseph Lett concedes that a CTR should have been filed following the exchange of the funds. However, the court disagrees with Mr. Lett as to the substance and degree of Dr. Lowe's knowledge of the reporting requirement, and his involvement in the bank's failure to file the CTR.

On or about February 14, 1990, Dr. Lowe engaged in a discussion with Charles Ray Davis (hereinafter Mr. "Davis"), a banker employed by Central Alabama Bank of the South, regarding a CTR filed in the name of his wife, Janice Lowe. Via affidavit, Mr. Davis testified that Dr. Lowe phoned him and stated that he had sent his wife to close some accounts at Central Bank of the South in Haleyville, Alabama. Dr. Lowe also stated that, as a result of that transaction, the bank completed a CTR. Dr. Lowe went on to note that he instructed his wife to return the currency and requested that the bank void the transaction and withdraw the CTR. Mr. Davis informed Dr. Lowe that the CTR

was mandatory and must be filed. Dr. Lowe then became irate and proclaimed that Davis was the poorest excuse for a banker that he (Dr. Lowe) had ever known.

■ Mr. Lett states that during his first telephone conversation with Dr. Lowe, which transpired in early September or early October, 1990, Dr. Lowe asked him a few general questions regarding currency reporting requirements. According to Joseph Lett, the crux of Dr. Lowe's questions focused on remaining an anonymous supporter of the donee school. Joseph Lett asserts that he answered Dr. Lowe's questions regarding currency reporting. The transaction at issue took place on November 14, 1990.

Based on the foregoing, the court finds that Dr. Lowe was cognizant of the CTR requirement and that Dr. Lowe appreciated the indispensable nature thereof. Dr. Lowe had knowledge that when sums of money in excess of $10,000 are involved in bank transactions, a CTR is mandatory. Joseph Lett stated that Dr. Lowe questioned him regarding the CTR requirement and requested to remain anonymous. From the foregoing statement, the court infers that the failure to file the required CTR was induced by Claimant's exhortation. Moreover, the court notes that a totally unexpecting depositor usually has no inkling that any reporting is mandated.

The court also finds that Dr. Lowe took advantage of the established relationship between himself and the Letts. As Mr. Lett stated, he only wanted to assist Dr. Lowe in retaining his anonymity. Based on Dr. Lett's knowledge and his relationship with the individuals who ultimately fractionalized the currency at issue, the court concludes that Claimant may not avail himself of the innocent owner defense.

Dr. Lowe asserts that his one time transfer of three hundred sixteen thousand, nine hundred eleven dollars ($316,911) was a lawful transaction. Claimant contends that after Claimant transferred the funds, the duty to file a currency transfer report rested with First Bank, not Dr. Lowe. Thus, if a CTR was not filed, liability allegedly rests with the

any importation or exportation of monetary instruments.

31 U.S.C. § 5324.

bank and injustice results if the currency is forfeited.

The court finds that rendering the result urged by Claimant would deprive the relevant provisions of their force and effectiveness and the strictures of §§ 5316 and 5324 could be easily circumvented. The art of purposeful or convenient ignorance would lead to the possibility of no transactions being reported, which clearly runs contrary to Congress' intent. Any person with funds in excess of $10,000 could enter his or her local bank and, with the proper exhortation, whether it be pecuniary or emotional, cause a bank's agent to fail to make the required filing. However appealing, assuming and even not doubting its veracity, Dr. Lowe's motive in aiding and abetting the structuring of the funds involved, is simply not sanctioned by the forfeiture provisions at issue.

### Conclusion

Because the court finds that the government has shown probable cause to seize the defendant currency and Claimant has failed to successfully rebut said probable cause, it is

CONSIDERED, ORDERED and ADJUDGED that the defendant currency in the amount of three hundred sixteen thousand, nine hundred eleven dollars ($316,911.00), together with the lawful interest thereon, be and the same is hereby FORFEITED to the United States of America.