**UNITED STATES of America, Plaintiff,**

v.

**ACCOUNT NO. 50–2830–2, LOCATED AT FIRST BANK, 814 EAST MAIN STREET, ROANOKE, ALABAMA, and all monies deposited therein, Defendant.**

**Civ. A. No. 91–D–689–E.**

United States District Court,
M.D. Alabama,
Eastern Division.

June 23, 1994.

## JURISDICTION

This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this stage of the case is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

## FACTS

On June 20, 1991, the United States of America filed this civil action against the defendant account to enforce the provisions of 18 U.S.C. § 981(a)(1) for the forfeiture of property involved in a transaction or at-

Redding Pitt, U.S. Atty., Montgomery, AL, John T. Harmon, Asst. U.S. Atty., for plaintiff.

Carl M. Seibert, Huntsville, AL, E.E. Edwards, III, Nashville, TN, for defendant.

## MEMORANDUM OPINION AND ORDER

De MENT, District Judge.

This matter is now before the court on claimant Dr. Richard T. Lowe, M.D.'s motion for judgment on the pleadings and summary judgment, filed April 29, 1994. The government responded with a brief in opposition on June 3, 1994. For the reasons explained below, the claimant's motion is due to be granted in part and denied in part.

tempted transaction in violation of 31 U.S.C. §§ 5313 and 5324. The claimant in this case is Dr. Richard Lowe.

In an effort to aid Chambers Academy, a private school located in the claimant's hometown of LaFayette, Alabama, Dr. Lowe during February 1988 placed the proceeds of several Certificates of Deposit (CDs), which were in the form of certified checks, in a one year CD at the First Bank of Roanoke, Alabama. The interest on the approximately $1,307,000 in the CD went directly to the Chambers County Educational Foundation (CCEF), an organization established to benefit Chambers Academy. Dr. Lowe's name was not placed on the account in any way because he wished to remain anonymous, seeking to benefit the school without receiving any public recognition. Dr. Lowe continued to add to the amount on deposit in the CCEF account, and by 1990, approximately $2.5 million dollars in CDs were on deposit in the name of CCEF.

In the fall of 1990, Dr. Lowe decided to deposit a large amount of cash, which he had had on hand at his home,[1] in a CD in the name of CCEF. In October 1990, Dr. Lowe contacted Mr. Joseph Lett, a long-time friend and President of First Bank of Roanoke, and told him that he had approximately $60,000[2] in cash which he would like to deposit. After arrangements for Mr. Lett and his wife to pick up the money at Dr. Lowe's home fell through, on November 14, 1990, Dr. Lowe, Mrs. Lowe, and their daughter loaded the boxes of money in their car to transport it to Mr. Lett at First Bank. On the way to Roanoke, Dr. Lowe's car became

disabled, and it was after banking hours when the Lowes arrived in Roanoke. According to his brief, Dr. Lowe then obtained directions to Mr. Lett's home. After arriving at the Lett home somewhere between the hours of eight or nine o'clock in the evening, Mr. Lett accepted the money and issued Dr. Lowe a typewritten receipt for the deposit.

Mr. Lett received a total amount in cash of $317,520. The expenses incurred from counting the cash and the expenses incurred from having Dr. Lowe's car towed to Haleyville totalled $690. Therefore, the net deposit and the amount that the court will refer to throughout its opinion is $316,911. Instead of directly depositing the money into the bank, Mr. Lett made numerous purchases of cashier's checks in amounts lower than $10,000. According to Dr. Lowe, Mr. Lett handled the cash in this way to preserve Dr. Lowe's anonymity. Dr. Lowe's anonymity was evidently to be preserved by having Mr. Lett deposit the amounts in increments of less than $10,000 so the legal requirement of filing Cash Transaction Reports (CTRs) for transactions involving over $10,000 could be evaded. No CTR was filed in relation to the $316,911 deposit. This is the transaction upon which the United States bases its action to forfeit the defendant account.[3]

## DISCUSSION

The United States seeks forfeiture of the defendant account pursuant to 18 U.S.C. § 981(a)(1)(A), which authorizes forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in vio-

1. Dr. Lowe was a child during the Great Depression of the 1930s. As a result of the strong impression the hardships of those years made on him, he evidently never completely regained his trust in banks. Consequently, from the beginning of his working life, he saved cash and kept it in boxes in his home. In 1990 after many years of saving cash in this manner, Mrs. Lowe became concerned about keeping so much cash on hand, due to the threat of theft and the threat of fire loss. At her prodding, Dr. Lowe agreed to deposit the money in the bank.

2. In a later conversation, Dr. Lowe told Mr. Lett that the money could total over $100,000. (J. Lett dep. at 49.) It was not until Mrs. Lowe finished counting the money and tabulating the bundles of cash that the Lowes realized the total

exceeded $300,000. Mrs. Lowe's calculations determined that the cash amounted to $315,291, which the bank later found to be in error. First Bank determined that the total should be $317,520, excluding $609, which covered the cost of the bank counting the money and the cost of having Dr. Lowe's car towed back to Haleyville after it became disabled.

3. In March 1991, the CCEF account, which consisted of CDs, had a balance of over $2.8 million. Because Dr. Lowe desired to make it easier for CCEF to withdraw amounts from the principle in addition to receiving the interest payments, the balance of the account was transferred into a money market account. The money market account is the defendant in this action.

lation of section 5313(a) or 5324(a) of title 31." Under 31 C.F.R § 103.22, a financial institution must file a CTR for any transaction involving currency of more than $10,000. Section 5324(a) of title 31 provides, in pertinent part, that:

> No person shall for the purpose of evading the reporting requirements of section 5313(a)[4] with respect to such transaction—
>
> (1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a);
>
> \* \* \* \* \* \*
>
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

31 U.S.C. § 5324(a) (West 1994).

Before forfeiture will lie, the government must demonstrate probable cause to believe that the seized property was involved in the structuring[5] of deposits to avoid the filing of a CTR in violation of § 5313(a). In order to establish probable cause, the government must have reasonable grounds to believe the account is subject to forfeiture. *See United States v. All Funds on Deposit in Great Eastern Bank Acct. No. 11008117*, 804 F.Supp. 444, 446 (E.D.N.Y.1992) (citing *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1160 (2d Cir.1986)). "Probable cause exists when the aggregate of facts gives rise to more than a mere suspicion that the property was involved in or intended to be involved in the illegal activity; the presence or absence of any single fact is not dispositive." *United States v. All Monies ($477,048.62) in Acct. 90–3617–3*, 754 F.Supp. 1467, 1471 (D.Hawaii 1991).

In the present case, Dr. Lowe argues that to properly consider the monies deposited in the defendant account, the monies should be divided into five classifications. Class I consists of $2,064,455.92 or the balance of the account less the $316,911 for which no CTR was filed. The other four classes consist of different portions of the $316,911. The court declines to create such classifications. The court finds that the only two figures to be considered are the balance of the account or $2,064,445.92, and the $316,911 for which no CTR was filed.

## I. $316,911

Dr. Lowe delivered approximately $316,911 in cash to Mr. Joseph Lett at his home after banking hours. Mr. Lett, in his deposition, recounted with the assistance of personal notes the events that lead to this unusual transaction:

> A. First call say: Late September, early October 1990.
>
> There's a question about depositing less than ten thousand dollars in cash, if it had to be reported. Dick [Dr. Lowe] said he had some cash that he wanted to put into the school's account. I asked him how much. He says forty to sixty thousand dollars. I asked him about the taxes on it. He said the money had been reported to the IRS and the tax had been paid. There was no tax problem with it. I told him I couldn't handle cash that way. *He asked if it couldn't be done over some period of time in amounts under ten thousand dollars because he still wanted to remain anonymous.*
>
> There's a second call when he said, well, I've got a little more money than I thought

---

**4.** 31 U.S.C.A. § 5313(a) provides:

(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

31 U.S.C.A. § 5313(a) (West 1983).

**5.** The process of structuring transactions to avoid the $10,000 reporting threshold is known as "smurfing." According to legal commentary, the nickname is descriptive of "[t]he army of persons who scurried from bank to bank to accomplish these transactions became known as 'smurfs' because, like their little blue cartoon namesakes, they were pandemic." Sarah N. Welling, *Smurfs, Money Laundering, and the Federal Criminal Law: The Crime of Structuring Transactions*, 41 U.Fla.L.Rev. 287, 287 (1989).

I had. How much have you got? He said, about a hundred thousand dollars. I asked him if he was going to give everything he had to the school. He said, well, I want to get everything out of my name, get it into the school's name. He was fearful at that stage that he might get a malpractice suit....

There was a third call. Both these calls referred to me going to Haleyville and getting the money and bringing it back. I never did. The third call was the fact that he said, well, don't come. We're going to be in LaFayette at such-and-such a day and I'll just bring it by to you, which is what he did. They brought the money in that night. It was more than I thought it was going to be, and I asked him where he got that. He said, well, he had accumulated it over four or five years. He had it in the closet. Janice was scared to death that the house was going to burn, and she wanted it out of the house. I asked him again, have you reported all this money? He said, yes, there's no tax problem; I have reported the money, paid tax on it. He wanted the money put in the account as soon as possible because the school needed the interest on it.

(J. Lett dep. at 48–50.) After receiving the money, Mr. Lett gave Dr. Lowe a typewritten receipt with his signature as president of the bank. (Lett dep. at 68–69.) Although Mr. Lett testified that the receipt did not constitute a deposit slip, he also said the reason that he issued the typewritten receipt and not a deposit slip was because Dr. Lowe wanted a receipt and because Mr. Lett did not have a deposit slip at his home. (Lett dep. at 69.) Dr. Lowe argues that the money was deposited at the time the money was entrusted to Mr. Lett to be placed in the CCEF account. Therefore, the subsequent transactions purchasing cashier's checks and transferring cash to other banks should be considered as transactions between financial institutions which do not require the filings of CTRs.

■ Mr. Lett, acting on behalf of the bank, gave Dr. Lowe a receipt, and as such, the transfer is essentially the same as a typical deposit that occurs hundreds of times a day in the average bank. The court finds that the $316,911 in cash which Dr. Lowe gave Mr. Lett to be deposited in First Bank triggered a duty for the bank to file a CTR. *See* 31 C.F.R § 103.22 (1993). 31 C.F.R. § 103.22 provides that "[e]ach financial institution ... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer ... which involves a transaction of currency of more than $10,000." 31 C.F.R. § 103.22(a)(1) (1993). It is undisputed that no CTR was filed in relation to Dr. Lowe's deposit.

Section 5324(a)(1) makes it unlawful for a person to attempt to evade reporting requirements by causing or attempting to cause a financial institution to fail to file a CTR concerning a transaction. *See* 31 U.S.C.A. § 5324(a)(1) (West 1994). There is sufficient evidence from which to conclude that Dr. Lowe knew of a bank's duty to file a CTR for transactions involving cash in excess of $10,000. In his deposition, Dr. Lowe described the incident involving his wife from which he learned that banks in certain situations had to file reports with the government. (Lowe dep. at 101–105.) Dr. Lowe's wife, Janice, deposited $11,000 in cash that she had previously withdrawn to attempt to buy an automobile. (*Id.* at 102.) The bank filed a CTR on the deposit. (*Id..*) Dr. Lowe testified that upon hearing this, he talked with the president of the bank in question and withdrew all of his money in the bank when the president did not give a satisfactory explanation of why a CTR had to be filed. (*Id.* at 106–108.) Dr. Lowe testified that,

Q. Why were you concerned about the report? What was your concern about it?

A. I didn't know why anybody should be reporting anything to anybody.

Q. I understand that was your concern. You didn't think anyone should report the transaction to anyone else?

A. I didn't think it was any of their business.

(*Id.* at 105.) Furthermore, in his deposition, Mr. Lett testified that prior to accepting the $316,911 deposit, Dr. Lowe had asked him if the money "couldn't be [deposited] over some period of time in amounts under ten thou-

sand dollars because he still wanted to remain anonymous." (Lett dep. at 48.) Dr. Lowe, throughout the events that comprise the facts of this case, exhibited an unusually strong desire to remain anonymous in all the transactions relating to the CCEF account. While the court respects Dr. Lowe's right to protect his privacy, the court finds that there are sufficient facts from which a jury could find that because of his desire to remain anonymous, Dr. Lowe influenced Mr. Lett not to file a CTR on the $316,911 cash deposit and in doing so, possibly violated § 5324(a)(1).[6] Because there are facts from which a jury could determine there was a possible violation of § 5324(a)(1), a jury could also find that the amount of the cash deposit, $316,911, is forfeitable under § 981(a)(1)(A).

Because the court finds that there are sufficient facts from which a jury could determine that the $316,911 cash deposit for which no CTR was filed is due to be forfeited as a result of a violation of § 5324(a)(1), summary judgment as to that amount is due to be denied.

## II. The Balance of the Account ($2,064,455.92)

■ The government argues that because of the deposit into the account was made in violation of § 5324(a), the entire account is forfeitable under § 981(a)(1)(A). Section 981(a)(1)(A) authorizes the forfeiture of all property "involved in" a predicate violation of § 981, which include violations of § 5324(a). According to the government, the entire account was involved in the illegal transaction because "the Defendant account and the foregoing CD's generated income for First Bank because they used the funds to conduct bank activities and thereby earned income." (Pl.'s Br. in Opp. at 8.)

Section 981(a)(1)(A) has been construed to authorize the forfeiture of an entire account which was used to facilitate money laundering in violation of 18 U.S.C. § 1956. *See United States v. All Monies ($477,048.62) in Account No. 90-3617-3,* 754 F.Supp. 1467, 1473 (D.Hawaii 1991). "[C]ourts have held that facilitation occurs when the subject property makes the underlying criminal activity 'less difficult or more or less free from hinderance.'" *United States v. All Funds on Deposit in Great Eastern Bank Account Number 11008117,* 804 F.Supp. 444, 446 (E.D.N.Y.1991). Courts have theorized that one illegal transaction passing through an account can "contaminate" the entire account, even though the other monies deposited in the account were derived legitimately. Judge Easterbrook in *United States v. $448,342.85,* 969 F.2d 474 (7th Cir.1992), described the phenomenon in the following way:

> This approach treats the accounts as the criminals, taking the concept of deodands one step further (an account is not even a tangible object). Bank accounts do not commit crimes; people do. It makes no sense to confiscate whatever balance happens to be in an account bearing a particular number, just because proceeds of crime once passed through the account.... An "account" is a name, a routing device like the address of a building; the money is the "property." Once we distinguish the money from its container, it follows that the presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water.

---

**6.** The Court of Appeals for the Seventh Circuit described the intent of § 5324, particularly the purpose to prevent the depositor from causing the bank to fail to file a CTR, in the following way:

> The target [of § 5324] was the transactors—the "money launderers," desiring to convert "hot," suspiciously large, or easily traced cash sums into more discreet media of exchange—themselves. The statute's aim was to prevent people from either causing the (usually innocent) bank to fail to file a required report or defeating the goal of the requirement that *large cash deposits be reported to the Internal Revenue Service by breaking their cash hoard into*

> *enough separate deposits to avoid activating the requirement.*

*United States v. Davenport,* 929 F.2d 1169, 1172–73 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 871, 116 L.Ed.2d 776 (1992). In a separate proceeding, the IRS required Dr. and Mrs. Lowe to pay $117,000 in tax deficiencies, penalties, and interest for taxable years between 1983–1886. For the taxable years between 1987–1991, Dr. and Mrs. Lowe were required to pay approximately $300,000 in tax deficiencies, penalties, and interest. (Cynthia Potts Aff.) Therefore, one might infer that Dr. Lowe had a strong desire to prevent a CTR from being filed.

*$448,342.85*, 969 F.2d at 476 (holding that all of the money in the particular case originated from criminal activity).

In *United States v. All Funds on Deposit in Great Eastern Bank Account Number 11008117*, 804 F.Supp. 444 (E.D.N.Y.1991), the court, in a forfeiture action brought under § 981(a)(1), found that deposits structured to avoid the filing of currency transaction reports should be treated differently if there were no information that the money was obtained illegally. *All Funds on Deposit*, 804 F.Supp. at 447. In so finding, the court opined that the considerations present when the money itself is tainted are not present where the only offense is structuring. *Id.* According to the court, "When money from illegal sources is commingled with 'clean' money, the illegal funds are cleansed and sheltered from detection." *Id.* The "clean" funds conceal the presence of the "tainted" funds. The court found that where all the money involved is clean, i.e., not derived from illegal activity such as the sale of drugs, for example, and the only illegal act is the structuring of deposits, only the structured money should be forfeited not the entire account.

Although Dr. Lowe has experienced some tax problems, there is no evidence in the present case that the money was obtained through illegal means. Dr. Lowe, from all accounts, is a concerned doctor who cares for multitudes of indigent patients. Because only "clean" money was involved in the structured transaction and because structuring is the only legal violation upon which forfeiture of the entire account is sought, the court finds that the court's reasoning in *All Funds on Deposit* should be followed in this case. The court further finds that the illegal deposit of $316,911 in cash did not "like a drop of ink falling into a glass of water" contaminate the entire defendant account. Therefore, summary judgment as to the balance of the defendant account is due to be granted.

## CONCLUSION

It is CONSIDERED and ORDERED that the claimant's motion to dismiss be and the same is hereby DENIED AS MOOT.

It is further CONSIDERED and ORDERED that the claimant's motion for summary judgment be and the same is hereby DENIED as to the $316,911, which was involved in a transaction for which no CTR was filed.

Finally, it is CONSIDERED and ORDERED that the claimant's motion for summary judgment be and the same is hereby GRANTED as to the $2,064,445.92, which was the balance of the account. Therefore, and for good cause shown, JUDGMENT in this regard is entered in favor of the claimant and against the United States of America.

Dr. Richard T. Lowe is entitled to the return of all seized funds in the account save the $316,911 which remains subject to forfeiture, and it is so CONSIDERED and ORDERED.